## MERCK & Co. *v.* UNITED STATES (No. 1299).[1]

1. "CRUDE."

Whether an article is crude is to be determined not by the processes which brought it into being, but by the additional processes to which it is submitted after its creation in order to fit it for its chief or only use.

2. PARAGRAPH 41, TARIFF ACT OF 1909.

The opium of the importation was not "dried," as that term is used in paragraph 41, nor powdered nor otherwise advanced in condition, and it was properly dutiable as opium, crude or unmanufactured, and not adulterated, containing 9 per cent and over of morphia.

### United States Court of Customs Appeals, June 1, 1914.

APPEAL from Board of United States General Appraisers, G. A. 7501 (T. D. 33788).

[Reversed.]

*Comstock & Washburn (Charles A. Darius* of counsel) for appellants.

*William L. Wemple,* Assistant Attorney General *(Charles E. McNabb,* assistant attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Opium in bricks and cakes, imported at the port of New York on March 5, 1910, and classified by the collector of customs as opium

---

[1] Reported in T. D. 34549 (26 Treas. Dec., 992).

"advanced beyond the crude state by drying, either artificially or naturally," was assessed for duty at $2 per pound under that part of paragraph 41 of the tariff act of 1909 which reads as follows:

41. Opium, crude or unmanufactured, and not adulterated, containing nine per centum and over of morphia, one dollar and fifty cents per pound; opium of the same composition, dried, powdered, or otherwise advanced beyond the condition of crude or unmanufactured, two dollars per pound;  *  *  *.

The importers protested that the merchandise was opium crude and unmanufactured and therefore dutiable at $1.50 per pound under the first clause of said paragraph 41.   The Board of General Appraisers overruled the protests and the importers appealed.

Some of the merchandise is known as Persian opium and some of it as Turkish opium, the Persian being imported in the form of bricks and the Turkish in lumps or cakes of irregular form.   As appears from the uncontradicted evidence in the record, opium is the inspissated juice of the poppy plant, which is secured by incising the capsules or bulbs of a species of poppy while the capsule or bulb is still unripe and the juice is running abundantly.   Through the incisions made in the capsule or bulb the juice or sap oozes out and is later scraped off by the opium farmer into small vessels, from which it is subsequently transferred into larger receptacles.   Just as taken from the plant the juice contains from 40 to 50 per cent of moisture, which must be very materially reduced by evaporation or other means before it reaches the status of the opium of commerce.   In the case of Turkish opium this purpose is accomplished to some extent by extraneous mat er, which finds its way into the juice and absorbs the moisture. The surplus moisture in Persian opium is eliminated by spreading the juice on boards and keeping a new surface constantly exposed to the sun until the product has been brought to a proper consistency by evaporation—that is to say, to the state of an inspissated juice. While still warm from the heat of the sun and to some degree still soft, the material is cut into the form of bricks and hardened by putting it aside to cool.   To preserve their shape and to prevent any further evaporation the bricks are then wrapped in paper, and in that condition they are known as Persian opium.

Persian opium as imported does not usually contain more than 10 per cent of moisture.   The moisture in Turkish opium sometimes runs as high as 28 per cent, but usually runs from 15 to 20 per cent.   The valuable content of opium is morphine, and as the percentage of that alkaloid in Persian opium is low and in Turkish opium high, the moisture in the Persian must of necessity be reduced to a much lower percentage than that of the Turkish product in order to secure the minimum of 9 per cent morphine prescribed for crude unmanufactured opium.   For the making of Persian opium far more elaboration and

manipulation are therefore required than for the manufacture of Turkish opium. Barring the spontaneous evaporation which results from exposure, the elimination of surplus moisture from Turkish opium is apparently left to the absorbent action of the extraneous matters mixed with the juice either designedly or through careless collection. Such a course, however, can not be pursued in the manufacture of Persian opium, as the weight of the absorbents would keep down the percentage of morphine, and consequently the Persian exporter is forced to dry out the collected juice by keeping a new surface constantly exposed to the rays of the sun. Due to the difference in the drying processes, Persian is cleaner and purer than Turkish opium, but it is evident that whether one process or another is employed the particular method used has no other purpose and accomplishes no other object than to bring the juice of the poppy to the status in which it is first known to commerce as opium.

We think that it may be admitted that the processes employed in making the opium in controversy were manufacturing processes and that opium may be considered as a manufactured product. Nevertheless, unless the opium once produced was subjected to further treatment or manipulation after having been brought to the state when it first became commercial opium, there is no escape from the conclusion that it was crude and unmanufactured opium within the meaning of the first clause of paragraph 41, otherwise no effect could be given to that provision. In the matter of Leggett (T. D. 21804); *In re* Peabody (T. D. 25443); United States *v.* Merck (66 Fed., 251); Littlejohn *v.* United States (119 Fed., 483); United States *v.* Continental Color & Chemical Co. (2 Ct. Cust. Appls., 165; T. D. 31679); United States *v.* Sheldon (2 Ct. Cust. Appls., 485, 487–488; T. D. 32245); United States *v.* Danker (2 Ct. Cust. Appls., 522, 524; T. D. 32251).

The term "crude" is not confined to something which is in a natural or raw state—something which has not been processed or prepared. "Crudeness" is a relative term, and whether an article is crude is to be determined not by the processes which brought it into being, but by the additional processes to which it is submitted after its creation in order to fit it for its chief or only use. Roessler & Hasslacher Chemical Co. (94 Fed., 822); Leber & Meyer *v.* United States (135 Fed., 243); United States *v.* Danker, *supra.*

Opium is imported into this country almost exclusively for the purpose of manufacturing morphine and other medicinal preparations, and it is clear from the evidence in this case that neither the Persian opium nor the Turkish opium in the condition in which imported is fit for use as a medicine or for the manufacture of morphine. The opium here involved is therefore crude and unmanufactured, not

only because its condition has not changed since it became opium, but because it must be subjected to further manufacture to fit it for use. (See cases above cited.)

In order that opium may be used for the preparation of medicines or to make morphine it must be, as appears from the evidence, either granulated or pulverized. (See also United States Pharmacopœia.) And to granulate it or pulverize it all the witnesses are agreed that the opium must be cut into slices and then dried out in an oven at a temperature not to exceed 85° C. As a result of this treatment the slices become dry and hard, and they are then put through a mill, which granulates them. If a powder is required the granulated opium is again dried in an oven or kiln and is brought to the condition in which it may be reduced to a powder by grinding.

When the Congress provided in the second clause of paragraph 41 for opium not adulterated, containing 9 per cent and over of morphine, dried or powdered, we think it had in mind opium subjected to some such manipulation as that just described. In this opinion we are confirmed by the history of the legislation. Paragraph 43 of the tariff act of 1897 provided for "opium, crude or unmanufactured, and not adulterated, containing nine per centum and over of morphia," and made no provision at all for dried or powdered opium or for opium advanced in condition. Under this provision it was sought to subject powdered opium to the duty of $1 per pound imposed on opium crude or unmanufactured by that paragraph, but it was held by the Circuit Court of Appeals in Merck v. United States (151 Fed., 14) that powdered opium was neither crude nor unmanufactured, and that, by powdering, the original product had undergone a treatment which destroyed its identity and produced another and more valuable article with a new use and a new commercial signification. The court accordingly held that powdered opium was not within the terms of paragraph 43 and was a drug advanced in value or condition by refining, grinding, or other process, and therefore dutiable under paragraph 20.

In the tariff act of 1909, as we have already seen, provision was made for opium, dried or powdered, or otherwise advanced in condition, and we think that that provision was intended to meet the defect in the law made apparent by the Merck case, and to provide by special designation for opium which, after it became opium, had been subjected to the manufacturing processes of drying or powdering or to other advancement. The view that dried opium means opium which has been subjected to a drying process after it is manufactured is strongly supported by the testimony of Cortlandt St. John, a Government witness and a dealer in opium for over 40 years. This witness testified that the trade made a distinction between dry opium and dried opium, and that dried opium was recognized in the

trade as opium which had been dried down to about as much moisture as it would lose, and that this condition was brought about by artificial drying—that is to say, by placing the opium in a kiln, oven, or drying room. He further stated that dried opium was imported in small pieces and in a comminuted form.

To hold that the new provision incorporated in the tariff act of 1909 was intended to cover all opium subjected to a drying process in the course of its manufacture would practically leave the first clause of paragraph 41 with nothing upon which to operate, inasmuch as in the production of all opium some drying is necessary. We must, therefore, hold that the opium under consideration was not dried as that term is used in paragraph 41 of the tariff act of 1909. We find that the opium under consideration, after it became opium, was neither dried, powdered, nor otherwise advanced in condition, and that it is properly dutiable at $1.50 per pound as opium, crude or unmanufactured, and not adulterated, containing 9 per cent and over of morphia.

The decision of the Board of General Appraisers is *reversed.*