QUONG LEE & CO. *v.* UNITED STATES (No. 3533) [1]

[1] T. D. 45981.

United States Court of Customs and Patent Appeals, October 31, 1932

*Lawrence & Baldwin* (*Martin T. Baldwin* of counsel) for appellant.
*Charles D. Lawrence*, Assistant Attorney General (*Reuben Wilson* and *Ralph Folks*, special attorneys, of counsel), for the United States.

[Oral argument October 3, 1932, by Mr. Baldwin and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This appeal involves the dutiable classification of a Chinese food material known as birds' nests. There is no specific provision in the Tariff Act of 1922 for the importation, and it must find its classification in the nonenumerated paragraph as a raw or unmanufactured article at 10 per centum ad valorem, or as a manufactured article at 20 per centum ad valorem, which paragraph reads as follows:

PAR. 1459. That there shall be levied, collected, and paid on the importation of all *raw or unmanufactured articles* not enumerated or provided for, a duty of 10 per centum ad valorem, and on *all articles manufactured*, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem. (Italics ours.)

The collector classified the merchandise under said paragraph 1459 and assessed duty thereon at 20 per centum ad valorem as a manufactured article.

Appellant protested, relying solely upon the claim that the merchandise was a raw or unmanufactured article and dutiable under said paragraph at 10 per centum ad valorem.

The United States Customs Court, Third Division, overruled the protest, holding the merchandise dutiable as assessed at 20 per centum ad valorem. From the court's judgment appeal is taken here, and the sole question involved in the case is whether or not the merchandise has been manufactured within the meaning of said paragraph.

At the trial of the cause at San Francisco, Lee Quan, a Chinese merchant, was the only witness. At the trial there were offered and admitted in evidence a stipulation of facts, and samples of birds' nests, which were involved in another case. The material portion of the stipulation, as found in the record, follows:

It is stipulated:

(1) That the merchandise in question consists of so-called birds' nests imported from China in various forms, and that the facts as to production and use of such birds' nests are as follows:

All grades shipped to the United States have been washed, and this operation consists in soaking the nests in successive baths of cold water to which some peanut oil is usually added. The latter serves the purpose of causing the feathers and foreign matter to come to the top where it can be drained off. The process is simply a mechanical one, and no cleaning fluids or other chemicals of any kind are used. Ten such washings of approximately one hour each are about the usual number for good-quality nests.

The lowest grade, mo yin, is rubbed into bits in a wooden tub in order to remove all feathers and foreign substances; and then the yin pie, or slices, are worked by hand into balls or threads, and from the latter into sticks and cakes.

While some of the koon yin are imported in perfect shape in the form of a cup, others are broken. These latter, after being soaked for a short time in water, are formed into perfect shape again by the addition of small pieces of "birds' nests" material.

None of the grades of "birds' nests" have been cooked nor are they ready to eat until they have been cooked for at least several hours. The nests are soaked in water until spongy, and then boiled together with either pork or chicken for 4 or 5 hours. The nest itself at the final stage has been dissolved into gelatinous particles which are eaten with the soup.

After the washing and manufacture of the different grades known as threads, balls, slices, sticks, and cakes, the "birds' nests" are dried either in the sun or by the use of charcoal fire. They are generally laid out on flat rattan baskets or trays in the open air, but if the weather does not permit, they are dried indoors. This is for the purpose of enabling the small pieces to stick together, thereby forming the larger units described above. After having been so dried they can remain in good condition without being damaged for long periods of time.

There are no methods of treatment other than those described above. The whole operation is done by hand and forms quite an industry within itself.

(2) That items 91/92 (protest 216318–G), 157/158 (protest 254891–G), 23½ catties in case 248 (protest 313529–G), and 51/52, 54 (protest 313517–G) consist of mo yin, rubbed into bits, but not formed into balls, threads, sticks, cakes, or slices.

(3) That items 53 (protest 313517–G) and 1/2 (protest 254895–G) consist of yin pie in the form of cakes or squares.

(4) That the item of 13¾ catties in case 248 (protest 313529–G) consists of koon yin in the form of cups.

(5) That the three samples filed herewith, marked mo yin, yin pie, and koon yin, represent those materials respectively, in their condition as imported, and may be received in evidence.

(6) That the protests are abandoned as to all other merchandise; that upon this stipulation and the official records the protests may be ordered submitted, and that plaintiffs may be allowed 30 days for filing brief after receipt of notice of the filing of this stipulation, with 30 days thereafter allowed defendant for brief.

While the stipulation refers to three kinds of merchandise, it is conceded that there are but two grades involved in this appeal, mo yin and yin pie.

The witness testified for the importer that the word "yin" means birds' nests; that the word "mo" means *loose;* that "pie" means *stuck together;* and that the two terms "mo yin" and "yin pie" merely describe the condition of the nests.

It is conceded that the importation is derived from the nests of birds from the Orient, which nests are made from the secretions of the birds' glands. It will be noted that it is stipulated as follows:

The lowest grade, mo yin, is rubbed into bits in a wooden tub in order to remove all feathers and foreign substances; and then the yin pie, or slices, are worked by hand into balls or threads, and from the latter into sticks and cakes.

\* \* \* \* \* \* \*

None of the grades of "birds' nests" have been cooked nor are they ready to eat until they have been cooked for at least several hours. The nests are soaked in water until spongy, and then boiled together with either pork or chicken for 4 or 5 hours. The nest itself at the final stage has been dissolved into gelatinous particles which are eaten with the soup.

After the washing and manufacture of the different grades known as threads, balls, slices, sticks and cakes, the "birds' nests" are dried either in the sun or by the use of charcoal fire. They are generally laid out on flat rattan baskets or trays in the open air, but if the weather does not permit, they are dried indoors. This is for the purpose of enabling the small pieces to stick together, thereby forming the larger units described above. After having been so dried they can remain in good condition without being damaged for long periods of time.

There are only two exhibits representing the merchandise involved in this appeal. The exhibit representing the mo yin consists of small, scalelike, irregular-shaped particles, in form somewhat resembling wheat bran, of a yellowish or brownish color and translucent in character; most of the particles or flakes are much longer than they are broad and have the appearance of having been broken from longer sticks of the same material. This material has been washed and rubbed into bits for the purpose of removing all feathers and foreign substances. The tub in which they were rubbed contained cold water and some peanut oil. The foreign substances during the washing process came to the top of the water and were removed. As far as the record shows, nothing further was done to the mo yin except that the water was removed by drying.

Different forms or kinds of yin pie are made by pressing the flakes together, forming threads, balls, slices, sticks or cakes. The yin pie at bar is in the form of a flat, circular cake about six inches wide and less than one-half inch in thickness, the surface of which is irregular, showing large and small pieces of birds' nests material stuck together. It has a shining translucent appearance and is of a yellow straw color.

It is the contention of the importer that both grades respond to the provision in paragraph 1459 providing for "raw or unmanufactured" articles, and that nothing has been done to the imported merchandise which brings it into the manufactured class; that all that has been done in the case of mo yin has been to wash it and free it of its impurities and remove the water which accumulated in the washing process; that in the case of yin pie, no process had taken place except the wash-

ing, removing the foreign materials, and getting the material by itself and into such form as would be convenient to handle.

The Government argues that the material is no longer a raw and unmanufactured article because new names are applied to it and that the merchandise has ceased to be birds' nests, and that, therefore, the processes applied to it have removed the same from the raw and unmanufactured condition within the meaning of the paragraph, and relies very largely upon the decision of this court in *Konishi Kotakudo Co.* v. *United States*, 17 C. C. P. A. (Customs) 355, T. D. 43798.

The determination of the question as to whether an imported article has gone through a process of manufacture in a tariff sense has often been considered by this and other courts, and an extended review of the cases is not regarded as necessary here. We are of the opinion that both classes of merchandise involved in this appeal are raw and unmanufactured within the meaning of the term as used in paragraph 145.,.

In *Cone & Co.* v. *United States*, 14 Ct. Cust. Appls. 133, T. D. 41672, this court had under consideration several grades of palmyra fiber which had been stripped from the leaves of an East Indian palm by pounding and cutting. The fibers were drawn through nails embedded in a board which separated the fiber from the pulp. The fibers were then jumped and evened at one end and tied into bundles by means of some of the fibers. In holding that this article was not a manufactured article within the meaning of the same paragraph here under consideration, this court said:

From the record it appears that nothing has been done to those fibers, after they were separated from the leaf in which they grew, except to collect them in bundles, even one end by jumping and tie the bundles. It can hardly be said, therefore, that they have been manufactured, in any way, since their extraction from the leaf. Nor are we of opinion that the processes of extraction from the leaf can be said to be manufacturing processes. By a long and uniform line of decisions, the courts, including this court, have held that an operation, or operations, which simply cleanses or cleanse the material desired and frees or free it from impurities, so that it may be used as raw material in manufacturing processes is or are not a manufacturing process or processes. The underlying theory upon which these cases were decided is that well expressed by Wheeler, J., in *United States* v. *Godwin*, 91 Fed. 753, when he stated that if the processes applied to the material were no "other than to get it by itself," the material could not be said to be manufactured. We have so held in case of cotton linters in *United States* v. *Solomon*, 1 Ct. Cust. Appls. 246; of rubber prepared from waste rubber articles, *United States* v. *Michelin Tire Co.*, 1 Ct. Cust. Appls. 518; of opium in bricks and cakes, *Merck & Co.* v. *United States*, 5 Ct. Cust. Appls. 347; of spruce gum, *United States* v. *Maine Central Railroad Co.*, 7 Ct. Cust. Appls. 114; of degummed silk waste, *Smillie & Co.* v. *United States*, 11 Ct. Cust. Appls. 199; and of carbonized wool, *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293.

The fact that the fiber in question may not be manufactured does not necessarily mean that it has not been dressed, for a material may be dressed and not manufactured. *United States* v. *Dudley*, 174 U. S. 670. * * *

In the case of *Smillie & Co.* v. *United States*, 11 Ct. Cust. Appls. 199, T. D. 38966, silk waste from which gum and foreign materials had been removed by boiling and manipulation, was held not to be manufactured. It was there said:

We are constrained to disagree with the board's decision, for, according to our view the boiling of the waste silk was not a manufacturing operation which converted it into partly manufactured spun silk, but was simply a cleansing treatment which advanced its condition as waste silk without converting it into anything else. * * * The present article, however, more correctly responds to the description of cleansed or degummed waste silk rather than that of partially manufactured spun silk.

This court in *United States* v. *Michelin Tire Co.*, 1 Ct. Cust. Appls. 518, T. D. 31544, had under consideration the term "manufactures of india-rubber" and held certain reclaimed or recovered rubber not to have gone through a manufacturing process. Old scrap rubber and refuse, from which the rubber was recovered, consisted of old rubber boots, shoes, tires, garden hose, etc. After the stock had been sorted and the metal parts cut away, the same was chopped in a machine. It was then baled and later went into crackers or grinding machines, and later heated and treated with a chemical solution for the purpose of removing the particles of fabric. It was then washed and all particles of cloth and foreign matter removed. After several operations it was pressed, dried on screens and sheeted. Concerning this merchandise the court said:

The first question for determination is whether or not this application of processes amounts to a manufacture. We think not.

They are all devoted to one end, as indicated by the name of the merchandise itself, "reclaimed or recovered rubber," to wit, the recovering of the rubber content from old worn-out goods into which it had been manufactured and of which it forms one of the component materials. The chopping of the old scrap or crude rubber, the segregation by hand therefrom of particles of iron, such as rivets, valves, etc., the grinding into smaller particles, the chemical treatment to which it is subsequently subjected, the bath which it undergoes immediately thereafter, the riffling and the blowing, are each and all devoted to the single and only purpose of separating the rubber from the other component materials of the scrap or refuse, and recovering or reclaiming it in a clean and pliable condition, eliminating therefrom all other parts of the scrap and adhering foreign matter.

The subsequent operations, even if we include the refining, which is not applied to the imported article, are applied not for the purpose of putting the material on its course of manufacture toward some ultimate article into which it is to be subsequently made, but are solely and only for the purpose of recovering and assembling it, as all rubber is assembled, into a form suitable for transportation and marketing. It has not been entered to any degree upon its course as any certain manufactured article, but is a raw material suitable for use in the manufacture of innumerable articles. Nor is it a manufactured material, but rather "demanufactured," if the term may be used, and recovered and restored so far as can be to its original condition as a single material.

In the last above-cited case numerous authorities are quoted and reviewed, supporting the position taken by the court.

198

The following cases, we think, support the position that the merchandise at bar is raw and unmanufactured: *Hawley* v. *United States* 19 C. C. P. A. (Customs) 47, T. D. 44893; *Pacific Iron & Metal Co.* v. *United States*, 15 Ct. Cust. Appls. 433, T. D. 42605; *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293, T. D. 40296; *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963; and *Merck & Co.* v. *United States*, 5 Ct. Cust. Appls. 347, T. D. 34549.

The merchandise involved in this appeal, in our opinion, in the condition imported, is a raw and unmanufactured product within the meaning of paragraph 1459, since no processes to which it has been subjected, prior to importation, advanced it toward its final use. It is a raw-food product and must be further elaborately processed before being consumed.. It is still cleaned birds' nests. The names applied to the two classes of the article, we think, do not indicate that the processes through which it has gone have manufactured it into a new article with a new name and a new use, but indicate the condition in which it is found after the processing.

In our judgment there is nothing in the *Konishi Kotakudo* case, *supra*, which is contrary to the views hereinbefore expressed. The question there was not whether glass had been manufactured, but whether the unpolished pieces of bent glass of various shapes were manufactures of glass. The majority of the court did not hold that the glass had not been manufactured, but that under the rule of single use the glass had not been manufacturd to a point where it was dedicated to some exclusive use and was, therefore, not a manufacture of glass.

As far as we know, the birds' nests when gathered in the Orient had but one commercial use. Such processes as were applied to them did not change such use nor advance them further toward such use except such cleansing, separation, and manipulation as, under the decided cases, will not remove them from their raw and unmanufactured condition.

The judgment of the United States Customs Court is *reversed* and the cause *remanded* for further proceedings in accordance herewith.