(C. D. 1391)

W. F. MACKAY ESTATE *v.* UNITED STATES

United States Customs Court, Third Division

(Decided February 19, 1952)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*John J. Antus* and *Richard E. FitzGibbon*, special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

JOHNSON, Judge: This action, arising at the port of Noyes, Minn., was brought against the collector's assessment of duty on frozen beef lungs imported from Canada. Two entries are involved. Entry 2589–A imported for the account of John Morrell & Co. of Ottumwa, Iowa, consists of 205 molds of "Frozen Beef Lungs." Entry 4846–A, imported for the account of the Rival Packing Co. of Chicago, Ill., consists of 409 molds "Froz. Inedible Beef Lungs." To entry 2589–A is attached a certificate from the Dominion of Canada to the effect that "the meat or meat food products herein described were derived from animals which received ante-mortem and post-mortem veterinary inspection at the time of slaughter, and that said meat and meat food products are sound, healthful, wholesome and otherwise fit for human food," etc.

Duty was assessed upon both shipments of beef lungs at the rate of 6 cents per pound under paragraph 706 of the Tariff Act of. 1930 providing as follows:

PAR. 706. Meats, fresh, chilled, frozen, prepared, or preserved, not specially provided for, 6 cents per pound, but not less than 20 per centum ad valorem.

Various claims are made in the protest by the plaintiff, but the one relied upon at the trial is that the beef lungs in question are properly dutiable at 10 per centum ad valorem under paragraph 1558, as non-enumerated unmanufactured articles, providing as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem * * *.

At the trial eight witnesses testified on behalf of the plaintiff. The Government had five witnesses, and then the plaintiff called two witnesses in rebuttal. The plaintiff's witnesses were variously qualified to testify as to the common and trade understanding of the term

"meat." Paul C. Johnson had 30 years' experience in the retail meat business. Val E. Ness had been a retail meat dealer for 38 years and was the vice president of the National Association of Meat Dealers. Leonard Force was the plant superintendent for the Canadian Packers, Ltd., the shipper, and had been associated with that firm for 32 years. Dr. Edward Czarnetzky was the chief biologist for more than 12 years in the research and technical department of Wilson & Co., meat packer. William V. Cavanaugh had been with the Rival Packing Co., a manufacturer of dog and cat food, for a period of 10 years, and for 20 years in that type of business. Earl Paxson had been in the meat-packing business for 40 years and was an employee of John Morrell & Co. That company is a meat packer and the manufacturer of Red Heart dog food. L. H. Davenport was in charge of the "variety meat division" of Swift & Co., with whom he had been associated for 26 years, and in the course of his employment had visited retail stores in all sections of the United States. C. E. Sheehy was the general manager of the Armour & Co. plant at South St. Paul for 21 years and had had 30 years' experience in the meat-packing business.

John J. Antus, the Government counsel, testified on behalf of the Government. Later, upon restoration of the case to the docket at the port of New York, Isadore Frank, a butcher since 1895; Dr. Leon Abrevaya, a veterinarian for the Department of Health, city of New York, for 21 years, who inspects meats and meat products consumed in the city of New York; Paul Coder, investigator for the United States Meat Inspection Service for 20 years; and Anna Hornick, a housewife, were called to the stand by the Government. In rebuttal, the plaintiff called Paul Henkel, for 23 years the president of the Society of Restaurateurs, and a hotel and restaurant operator; and Joseph Eschelbacher, secretary of the New York State Association of Retail Meat Dealers, Inc., for 8 years, and for 20 years secretary of his particular branch of such association, the New York-Bronx Retail Meat & Food Dealers, Inc.

The United States Department of Agriculture Regulations governing meat inspection, particularly as to § 1.1 (u), (v), and (w), were admitted in evidence on behalf of the plaintiff as exhibit 1. Counsel for the Government, with consent of plaintiff's counsel, indicated § 10.17 (a) and (b) of exhibit 1, as a Government exhibit. A menu of the Kimberly Restaurant in New York, indicating therein "Lungen stew with kasha" was admitted in evidence on behalf of the Government as exhibit 2. The plaintiff supplied a luncheon and a dinner menu of Hans Jaeger's restaurants, not showing that lungen stew was served among the entrees thereof, as exhibits 3 and 4, respectively.

The evidence produced by the foregoing witnesses concerning the use of beef lungs as an item of food for human consumption is substantially as follows: Dr. Czarnetzky, plaintiff's witness, had seen beef

lungs served in a restaurant on one occasion. Mr. Antus had eaten beef lungs for 30 years beginning at his home in Pennsylvania, but had not eaten them in his home since his marriage. He had seen beef lungs in butcher shops in the poorer neighborhoods in New York City and had seen beef lungs served in the form of lungen stew in restaurants around Times Square. He found the beef lungs in such stew to be tender and rather porous. He significantly stated, however, that—

* * * I know of some people who feel squeamish about eating them, but if they thought enough about it, they would eat them. I have been initiated into eating that dish before I thought of certain phases of it. I suppose it is very clean and they are edible.

Mr. Frank had handled beef lungs since he had been in the business, buying them from certain local slaughterhouses. His sales of beef lungs to private individuals averaged 50,000 pounds a year, and although he did not know the purpose for which the beef lungs were purchased, he presumed the use was for human consumption. Although Mr. Frank supplied meat to city and state hospitals in New York and New Jersey for a period of 40 years, such institutions had never purchased beef lungs. He also stated that he uses beef lungs himself in the form of a stew. Dr. Abrevaya, whose duties included the inspection of meat and meat products consumed in the city of New York, had eaten beef lungs in the form of lungen stew for 35 or 40 years. He was of the opinion, however, that beef lungs are not in themselves meat but when mixed with meats they become a meat food product. He would classify lungs as a meat byproduct. Exhibit 2 is the menu for the restaurant where he had eaten lungen stew. Paul Coder, Government witness, had seen beef lungs in restaurants in the form of lungen stew. As an investigator for the United States Meat Inspection Service, his territory covered the entire United States. His inspection of beef lungs was made for the purpose of discovering whether or not there were conditions present which might be harmful to human health, that is to say, whether any foreign matter "had been ingested, and also to determine whether there was any pathological condition that would indicate its condemnation rather than its use as an article of human food." When read the definition of "meat" in exhibit 1, and asked whether cattle lungs or beef lungs fell within the definition of "meat," the witness replied that it did not. In addition to lungen stew, the witness stated that an Italian dish called "soufritti" was made from beef lungs. Anna Hornick for a number of years had prepared lungen stew and she recited her recipe for it. She also considered it a food for human consumption, but when served as a meat dish, *she always added meat to it.* She had never heard of anyone broiling beef lung and did not think it would be tender enough for that purpose.

Unlike some of the foregoing witnesses dealing in meat, Mr. Johnson testified that although he sells fresh and processed meats, he had never sold cattle lungs nor had he heard of any being sold as edible meat or served in any restaurant as food. Mr. Ness also had never sold cattle lungs because he did not consider them edible meat. He had never eaten lungs nor seen them served in any restaurant.

Mr. Force stated that the lungs in question were prepared for shipment to the United States by rinsing them with water, splitting the lobes for inspection purposes, chilling, and freezing them. He did not regard lungs as meat but just a byproduct. He had never eaten lungs and did not consider them edible. In Canada, he stated that lungs were not sold for human consumption. In the packing plant where he is employed, about 90 per centum of the lungs are rendered into animal foods and the remaining 10 per centum sold for use in dog food. He had never eaten lungen stew nor seen it on a restaurant menu. Besides, he would not eat beef lungs because of the fact that they do not look appetizing. He considers them an unhealthy organ, not suitable for food purposes.

Mr. Cavanaugh's company uses lungs solely in the manufacture of dog and cat food, and the lungs in question were used for that purpose. He did not consider beef lungs an edible product. To his knowledge, in the trade, beef lungs are recognized as a commodity used only in the manufacture of dog food. Mr. Paxson's company used the beef lungs in question in the manufacture of Red Heart dog food. He stated also that the chief use of lungs in the United States is in the manufacture of dog food and 10 per centum or less is used in the manufacture of a very cheap sausage. Under definitions given in the meat inspection regulations, lungs could not be considered to be meat. He had never eaten beef lungs although he admitted they were edible, and although the Bureau of Animal Industry considers beef lungs edible, they are not generally eaten as food.

Mr. Davenport's company uses cow lungs in the manufacture of Pard dog food and does not use lungs in the manufacture of any product for human consumption. In his opinion, 95 to 96 per centum of cow lungs is used for dog food, 3 or 4 per centum is used by pharmaceutical manufacturers, and 1 or 2 per centum by fish hatcheries. In his opinion, he would not consider lungs to be meat for the reason that they are not skeletal meat but a tissue, an organ, and they do not fall within the meaning of meat as defined by the meat inspection regulations, nor within the common dictionary meaning of meat. In his experience, lungs are not sold as meat generally in the United States. Mr. Davenport also had never seen lungs on any restaurant menu, and had never eaten them. For the past 20 years, a majority of the lungs produced by his company in its packing plant has been used for dog food.

Mr. Sheehy, who has had experience in most of the phases of the meat-packing industry, had only known beef lungs to be used in the manufacture of dog and cat food and the production of animal feed generally. His plant used beef lungs solely for the production of cat and dog food for the past 10 years. Prior to that time, they were shipped to other plants for that purpose or used for the production of animal food for hogs and cattle. In his experience, the chief use during the past 20 to 30 years has been in the manufacture of animal foods, a minor use in the manufacture of pharmaceuticals, and the remainder in the manufacture of sausage. In his opinion, lungs are not considered meat but are a byproduct and do not fall within the definition of meat as defined by meat inspection regulations. He had never eaten lungs and had not seen them on sale in any butcher shops or in restaurants.

Dr. Czarnetzky also is familiar with most of the products which his company sells and has studied the nutritive, biochemical, and esthetic qualities of cattle lungs. His company uses cattle lungs in the manufacture of Ideal dog food. A small amount of cattle lungs is used in the manufacture of biological drugs, but the majority of the cattle lungs sold by his company is to companies which manufacture dog food. In his opinion, the chief use of cattle lungs is in the manufacture of dog food.

Dr. Czarnetzky also stated that the Government regulations relative to meat inspection, issued by the United States Department of Agriculture, govern the classification and disposition of all products, edible and otherwise, which are derived from slaughtered animals. In his opinion, lungs do not fall under the Department's definition of "meat" as they are not skeletal nor part of the muscle but are organs which do fall within the definition of "meat byproduct." He considered the definition of "meat" in exhibit 1 as a standard definition of that term.

Counsel for the plaintiff read to the witness the definition of "meat," as found in Webster's New International Dictionary, Second Edition, definition 3, as follows:

The flesh of animals used as food; as a breakfast of bread and fruit without meat; specifically flesh as distinguished from fish or fowl. Commercially in the United States meat means the dressed flesh of cattle, swine, sheep, or goats, except where used with a qualifying word as in reindeer meat, crab meat.

Dr. Czarnetzky was of the opinion that beef lungs do not come within that definition of "meat." Also, he would not recommend the use of beef lungs for human consumption because they often contain slime which is odorous, because they act as a filter for bacteria, and because they have very little nutritive value. In his opinion, the majority of people do not consume lungs in any form. About 98 or 99 per centum of lungs processed by his firm is used in the preparation of dog or animal food.

Exhibit 1 defines meat, meat byproduct, and meat food product as follows:

§ 1. 1 (u) **Meat.** The edible part of the muscle of cattle, sheep, swine, or goats which is skeletal or which is found in the tongue, in the diaphragm, in the heart, or in the esophagus, with or without the accompanying and overlying fat, and the portions of bone, skin, sinew, nerve, and blood vessels which normally accompany the muscle tissue and which are not separated from it in the process of dressing. It does not include the muscle found in the lips, snout, or ears.

(v) **Meat byproduct.** Any edible part other than meat which has been derived from one or more cattle, sheep, swine, or goats.

(w) **Meat food product.** Any· article of food, or any article intended for or capable of being used as human food which is derived or prepared, in whole or in substantial and definite part, from any portion of any cattle, sheep, swine, or goat, except such articles as organo-therapeutic substances, meat juice, meat extract, and the like, which are only for medicinal purposes and are advertised only to the medical profession.

The same exhibit also has a section concerning the inspection of lungs which provides as follows:

§ 10.17 **Inspection of cattle, calf, and sheep lungs; hog lungs not to be saved as edible.** (a) All cattle, calf, and sheep lungs intended for food purposes shall be inspected to determine whether foreign matter is present in the air passages. The main bronchi and branches shall be slit by employees of the establishment as required by the inspector, and, if ingesta or other objectionable foreign matter has entered these passages, the lungs shall be condemned.

(b) Hog lungs shall not be saved as edible product.

The sole issue in this case is whether or not the imported merchandise, frozen beef lungs, is to be classified as "meat" under the provisions of the Tariff Act of 1930. It is not disputed that frozen beef lungs and fresh beef lungs are the same, the freezing being merely to preserve them.

It appears from the evidence that beef lungs are used by the large meat-packing houses in the United States chiefly in the manufacture of dog food, with small percentages being used in the manufacture of pharmaceuticals and of sausage. However, the record also shows that beef lungs are eaten as food by some part of the population. The question is whether an article which has a relatively minor use as food for human consumption can be considered "meat" within the meaning of the tariff act.

Counsel for the plaintiff contends that as the evidence establishes that beef lungs are not known in the trade as meat, and are not defined in the dictionary or by the United States Department of Agriculture as meat, and as there is not a substantial use of beef lungs as meat, they are not meat for tariff purposes, and therefore are properly classifiable as a raw or unmanufactured article, not specially provided for. Counsel for the Government, on the other hand, contends that beef lungs are meat as that term is commonly and generally understood.

The term "meat" has been variously defined. In Webster's New International Dictionary, Second Edition, we find:

**meat** * * * **3.** The flesh of animals used as food; * * * specif., flesh (=FLESH, *n.*, 2), as distinguished from *fish* or *fowl.* Commercially, in the United States, *meat* means the dressed flesh of cattle, swine, sheep, or goats, except where used with a qualifying word, as in *reindeer meat, crab meat.* [Italics quoted.]

**flesh** * * * **1.** In its broadest sense, the soft parts of the body of man or of an animal, especially a vertebrate animal, usually excluding the integument. Commonly, however, *flesh* is used of those parts composed chiefly of muscle, and hence excludes most of the viscera contained in the cavities of the body. When used or prepared for use as food it is commonly termed *meat* * * *. [Italics quoted.]

In Encyclopaedia Britannica, Vol. 15, p. 145, the term "meat" is defined as follows:

Meat is the flesh or edible offal of domestic animals used for food. * * * Offal parts commonly used for food include liver, heart, tongue, brain, sweetbreads (thymus glands) and tripe. * * *

In the case of *Swift & Co.* v. *United States,* 47 Treas. Dec. 466, T. D. 40831, affirmed in *United States* v. *Swift & Co.,* 13 Ct. Cust. Appls. 542, T. D. 41428, relative to the term "meat," the court stated:

* * * The common acceptation of the term "meat" is that part of the animal tissue of certain animals which is used for human food, among which liver is properly classified.

The appellate court, in affirming the foregoing decision, stated that the term "meat" "has a signification broad enough to include the livers in this case."

In the case of *J. T. Steed & Co. (Inc.)* v. *United States,* 36 Treas. Dec. 544, T. D. 38053, the court stated as follows:

* * * Therefore, without facts to show what is included within the term "meats of all kinds" we must give it the meaning understood by ordinary people of common intelligence in the daily transactions of life and trade, in harmony with the specific declaration of the statute. We must do so keeping constantly in mind the meaning and the intent of the statute. We must do so with reference to that meat which harmonizes with common sense and ordinary intention.

An examination of the Tariff Act of 1930 discloses that specific provisions have been made for (according to the foregoing dictionary definitions) "the dressed flesh of cattle, swine, sheep, or goats" and "the edible part of the muscle of cattle, sheep, swine, or goats which is skeletal." (See provisions in paragraphs 701 through 704 specifically made for beef and veal, mutton and lamb, pork, and reindeer meat, fresh, chilled, or frozen.) It follows that the provision for meats in paragraph 706 was intended to cover other edible portions of animals. See *United States* v. *Swift & Co., supra.* This is also indicated by the material included under paragraph 706 of the Sum-

mary of Tariff Information, 1929, pp. 1045–1049. The statistics on domestic production cover beef, pickled and cured, canned meats and sausages, sausage, not canned, and edible offal. As to imports, it is stated (p. 1046):

Imports consist mainly of canned meats, chiefly beef, and come largely from Argentina and Uruguay. There are also unimportant imports of canned rabbit meat and of frozen rabbits from Australia, or dried beef from South America, of miscellaneous canned meats, and of edible offal (livers, sweetbreads, etc.) and bologna and other sausage, chiefly from South America and Canada. * * *

See also the Summary of Tariff Information, 1921, p. 646, where it is stated:

Under this head [sausage casings, etc., and meats prepared or preserved n. s. p. f.] fall pickled and cured beef, pickled pork, canned meats, sausage, sausage casings, scrapple, head cheese, livers, sweetbreads, etc.

Also pertinent are the modifications of paragraph 706 found in certain trade agreements negotiated since the passage of the Tariff Act of 1930:

### Trade agreement with Canada, T. D. 49752:

Edible animal livers, kidneys, tongues, hearts, sweetbreads, tripe, and brains, fresh, chilled, or frozen, 3¢ per lb., but not less than 15% ad val.

### Trade agreement with Paraguay, T. D. 51649:

Meats, prepared or preserved, not specially provided for (except meat pastes other than liver pastes, packed in air-tight containers weighing with their contents not more than 3 ounces each), 3¢ per lb., but not less than 20% *ad valorem.*

### General Agreement on Tariffs and Trade, T. D. 51802:

Edible animal livers, kidneys, tongues, hearts, sweetbreads, tripe, and brains, fresh, chilled, or frozen, 1½¢ per lb., but not less than 7½% ad val.

Meats, prepared or preserved, not specially provided for (except beef packed in air-tight containers and pickled or cured beef or veal), 3¢ per lb., but not less than 10% ad val.

In *United States* v. *Swift & Co., supra,* it was held that beef and calf livers fell within the provision for meats in paragraph 706 of the Tariff Act of 1922. In *F. W. Myers & Co., Inc.* v. *United States,* 29 C. C. P. A. 30, C. A. D. 167, it was held that beef livers, which were of the same class and kind as beef livers consumed as meat food in the United States, were dutiable as meat under paragraph 706 of the Tariff Act of 1930, although certain formalities necessary for exportation for food purposes had not been complied with. However, where a finding of fact was made by United States authorities that beef livers imported from Argentina were not fit for human consumption and were not used for food purposes in this country, it was held that they were not classifiable as meat under paragraph 706. *United States* v. *Judson-Sheldon Corp.,* 37 C. C. P. A. 89, C. A. D. 424.

It has also been held that beef hearts, tripe, and pork liver paste are dutiable as meat. *Swift & Co.* v. *United States,* 55 Treas. Dec.

1146, Abstract 8678; *Swift & Co.* v. *United States*, 57 Treas. Dec. 1187, Abstract 11669; *Neuman & Schwiers Co.* v. *United States*, 56 Treas. Dec. 313, T. D. 43617; *Neuman & Schwiers Co. (Inc.)* v. *United States*, 19 C. C. P. A. 375, T. D. 45511.

It is significant that the items mentioned above (in the Summaries of Tariff Information, the trade agreements, and the court decisions) are articles commonly considered to be meat and ordinarily used for human consumption.

On the other hand, it has been held that inedible portions of cattle, such as glands, do not fall within the provision for "meat." *Frankfeld & Co.* v. *United States*, 7 Ct. Cust. Appls. 296, T. D. 36805; *Vandegrift & Co.* v. *United States*, 13 Ct. Cust. Appls. 30, T. D. 40865. In *Frankfeld & Co.* v. *United States, supra*, it was held that pituitary glands which might accidentally be eaten as a part of calves' brains were not classifiable as meat. The court said (p. 298):

It would seem sufficient to point out that the record fairly and clearly shows the importations not only unfit for human consumption but that their sole and exclusive use is otherwise. The possible accidental consumption of them as a part of calves' brains so consumed, which was only surmised by one witness, if true, would not be tantamount to or approximate satisfactory proof of such, no more than similar accidental consumption of particles of the shell of an egg or the hull of a nut would establish such excrescences suitable for human consumption. Moreover, the provisos to paragraph 545 make certain the intent of Congress in the use of the term "meats" therein to refer to those of everyday consumption, which are the subject of the meat-inspection laws of the country, its States and municipalities, of which these importations are not one.

The proviso to paragraph 545 of the Tariff Act of 1913, referred to above, prohibits the entry of meat into the United States unless it is fit for human food and unless the rules and regulations of the Secretary of Agriculture have been complied with. After entry, such meats are to be treated as domestic meats within the meaning of and subject to the provisions of the Food and Drugs Act. Similar provisions are now contained in section 306 (b) of the Tariff Act of 1930.

In *J. T. Steed & Co. (Inc.)* v. *United States, supra*, it was held that the flesh of the whale was not "meat" within the provisions of paragraph 545 of the Tariff Act of 1913 for "meats of all kinds, prepared or preserved, not specially provided for." The court said (p. 550):

* * * We have not a single fact that this flesh of the whale, if it is a meat, is ordinarily known or accepted as a meat of commerce. Its use as meat is so limited the world over that we have the right to accept as conclusive that commerce has not placed it in the domain of meat. Therefore, without facts to show what is included within the term "meats of all kinds" we must give it the meaning understood by ordinary people of common intelligence in the daily transactions of life and trade, in harmony with the specific declaration of the statute. We must do so keeping constantly in mind the meaning and the intent of the statute. We must do so with reference to that meat which harmonizes with common sense and ordinary intention.

From these authorities it appears that the term "meat" as used in the tariff acts includes such portions of the animal as are habitually eaten as food, which are of everyday consumption, and which are ordinarily known as, and accepted as, a meat of commerce.

The evidence in this case establishes that beef lungs are used almost exclusively in this country for purposes other than human food and that their use for human consumption is limited to a small segment of the population and to certain localities, principally in the vicinity of New York City. In fact, the only evidence that they are used outside the metropolitan area is Mr. Antus' statement that he had eaten them in his home in Pennsylvania and Mr. Coder's statement that he had seen them in restaurants in various states. Since he did not specify, this might mean those states more or less in the metropolitan area, such as New York, New Jersey, and Connecticut. Such evidence does not establish that beef lungs are items of everyday consumption by any substantial part of the population of this country. As a matter of fact, the only manner in which beef lungs are described as a meat dish is in the form of lungen stew. Lungen stew is described as also including meat in addition to beef lungs and, therefore, lungen stew alone, even if classed as a meat stew, does not obtain such classification alone from beef lungs.

This court is of opinion that it was not the intention of Congress to include within the term "meat" any article used almost exclusively in the manufacture of dog and cat food even though a small portion is used for human consumption. See *F. W. Myers & Co., Inc.* v. *United States, supra,* where beef liver imported for use in the manufacture of medicinal preparations was held dutiable as meat on the ground that it was "of the same class and kind as beef liver consumed as meat food in the United States." Conversely, beef liver of a kind not habitually eaten as food is not classified as "meat." *United States* v. *Judson-Sheldon Corp., supra.*

The record indicates that the beef lungs herein were split for inspection purposes and frozen for preservation. It does not appear that these processes advanced them toward their ultimate use. It has been held that frozen lamb is dutiable as "fresh lamb" rather than as "meats prepared or preserved" and that frozen guavas are dutiable as "fruits in their natural state" rather than as "guavas prepared or preserved." *United States* v. *Conkey & Co.,* 12 Ct. Cust. Appls. 552, T. D. 40783; *John A. Conkey & Co.* v. *United States,* 16 Ct. Cust. Appls. 120, T. D. 42766; *Frosted Fruit Products Co.* v. *United States,* 18 Cust. Ct. 119, C. D. 1054. It follows that freezing the beef lungs in the instant case did not constitute a manufacturing process. Since beef lungs are not enumerated in the Tariff Act of 1930, they are properly dutiable at 10 per centum ad valorem under paragraph 1558 as raw or nonenumerated unmanufactured articles.

The protest is sustained and judgment will be rendered for plaintiff.