(C. D. 1578)

A. N. DERINGER, INC., ET AL. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided January 20, 1954)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiffs.

*Warren E. Burger*, Assistant Attorney General (*Samuel D. Spector*, *Harold L. Grossman*, and *John J. Antus*, special attorneys), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: This action involves certain importations from Canada, which were entered at the ports of St. Albans, Vt., and Pembina, N. Dak., during the period from December 1947 to April 1949. The merchandise is described on the invoices as frozen beef lungs, frozen beef melts, and frozen beef spleens. Duty was assessed thereon at the rate of 6 cents per pound under paragraph 706 of the Tariff Act of 1930, as—

> Meats, * * * frozen, * * * not specially provided for * * *.

The merchandise is claimed properly dutiable as nonenumerated raw or unmanufactured articles, under paragraph 1558, at the rate of 10 per centum ad valorem as to the items entered prior to January 1,

1948, and at 5 per centum ad valorem under said paragraph, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as to the merchandise entered after January 1, 1948.

When hearings were initially held at the ports of St. Albans and Minneapolis, Minn., it was agreed between counsel that the frozen lungs, melts, and spleens were similar in all respects to the frozen beef lungs the subject of decision in the case of *W. F. Mackay Estate* v. *United States*, 28 Cust. Ct. 73, C. D. 1391. The record in that case was incorporated with and made a part of the record herein. In view of this agreement as to similarity, we will accept the testimony as to the lungs here involved to be applicable also to the spleens and melts. The plaintiff in each case thereupon rested. However, upon motion of Government counsel, the cases were transferred to New York for further hearing of Government witnesses. When coming on for trial at the port of New York, over objection of Government counsel, all of the protests were consolidated.

The *Mackay* case, *supra*, also involved frozen beef lungs imported from Canada. In that case, however, no question was raised concerning any difference between fresh beef lungs and frozen beef lungs. The testimony concerned beef lungs, and whether or not the witnesses were referring to frozen beef lungs was not raised. Nor was it disputed that fresh beef lungs, when frozen, were other than fresh beef lungs merely frozen for preserving purposes, without any change in characteristics. However, three witnesses testified as to the use of the particular frozen beef lungs there imported. These witnesses testified without contradiction that the frozen beef lungs were used only in the manufacture of dog and other animal food and that such lungs were not edible. All of the plaintiff's witnesses in the incorporated case were of the opinion from their experience in the meat-packing business that beef lungs were chiefly used in the manufacture of dog and animal feed and that such beef lungs were not meat but a meat byproduct. Some of the Government's witnesses had sold beef lungs, presumably fresh beef lungs, at retail in their butcher shops, but, of course, could not testify as to the use thereof. Others had eaten beef lungs in a stew but were of the opinion that such stew only became known as a meat stew when it contained meat mixed with the beef lungs. One witness for the Government had seen lungen stew on restaurant menus but he, also, was of the opinion that beef lungs did not fall within the definition of meat. A housewife, who made lungen stew, testified for the Government that she added meat to the lungs and that the meat so added was what made it a meat stew and not the lungs. She also was of the opinion that beef lungs would not be tender enough to eat if broiled.

This court, in that case, considered the common meaning of the words "meat" and "flesh," as found in various dictionaries and as

construed by the courts, concerning other edible portions of animals, and concluded that the term "meat," as used in the tariff acts, includes—

> * * * such portions of the animal as are habitually eaten as food, which are of everyday consumption, and which are ordinarily known as, and accepted as, a meat of commerce.

The court found that beef lungs which, of course, would include the fresh lungs as well as the frozen, were not established by the evidence to be items of everyday consumption by any substantial part of the population of this country, and interpreted paragraph 706 as not including beef lungs because it was not the intention of Congress to include within the term "meat" any article used almost exclusively in the manufacture of dog and cat food, even though a small portion was used for human consumption. The court, therefore, held that beef lungs, not habitually eaten as a meat food, were not classifiable as meat.

At the trial of this case, it appeared that the issue is identical with the *Mackay* case, *supra.* The issue again arose because the Commissioner of Customs issued instructions not to apply the ruling by this court to other shipments for the following reason:

> As the Assistant Attorney General believes that evidence can be obtained to support the Government's position in the above-mentioned case, it is proposed to retry the issue involved. [T. D. 53027.]

Counsel for the Government at the opening of the trial made a statement that the *Mackay* case, *supra,* was not appealed—

> * * * because although we disagreed with certain legal principles enunciated by the court these legal principles seemed to be bound up with certain factual statements or facts in this case. The Government felt that it required time to present proof of the facts which should enable this court, in our opinion, to make a different finding.

Government counsel further moved for a continuance of the action by transfer to the ports of Chicago, Philadelphia, Baltimore, Buffalo, Detroit, St. Louis, Los Angeles, San Francisco, Miami, Dallas, Cincinnati, and Pittsburgh for the purpose of presenting testimony, which he believed necessary and essential, if he were to hope for a modification of the court's decision, and for the purpose of showing—

> * * * that the use of beef lungs for human consumption is indulged in not only by people of Jewish extraction, not only by kosher users, but non-kosher users, by people of Italian, German, Hungarian, Roumanian extraction, by a major segment of practically all the peoples from southeastern Europe and that that use of beef lungs for edible purposes as food, as meat, is universal throughout the United States.

Although Government counsel admitted that such transfers would cause a definite hardship upon the importers for the reason that a final decision would not be rendered until some time in the future,

and also that he was not ready at the present time to ask transfers to a definite port, having no evidence ready to present at such ports, he acted upon the assumption and his conviction that such evidence could be there obtained.

Counsel for the plaintiffs objected to the motion for the reason of the great delay in obtaining a final decision and also for the reason that such evidence would be accumulative, inasmuch as half of the Jewish population of the United States resided in New York City. Plaintiffs' counsel pointed out that the action herein had been pending for 3 years and that the Government had ample opportunity to obtain witnesses at the hearings, which were held in the Middle West, but failed to do so. Plaintiffs' counsel furthermore conceded that the testimony obtainable in the other ports would be of the same character as that obtained in New York City. He was also willing to concede that—

> * * * total sales of fresh lungs that are sold fresh outside New York City equals in quantity those sold in New York City. * * * And we are further willing to agree that the chief use of all lungs that are sold fresh throughout the United States is for human consumption.

Plaintiffs' counsel stated that he was willing to make such concessions for the reason that—

> * * * we are trying hard to get this case disposed of finally without any further delay.

Counsel for the Government admitted that it was practically impossible to obtain witnesses even in New York City and made further motion that evidence from other parts of the United States be obtained by means of depositions. Counsel for the plaintiffs further objected to the motion to include the proposed depositions as evidence in the case. The motions were taken under advisement by the court until the completion of the trial.

At the completion of the Government's case, counsel for the Government, respecting the motion for transfer to various ports in the United States, stated that he and plaintiffs' counsel had attempted to reach—

> * * * some sort of a fair agreement which would obviate the necessity of prolonging this trial, God knows how many years.

In view of the stipulation which was entered into, he withdrew the motions to transfer the cases or to take interrogatories of witnesses throughout the United States. The stipulation appears on the record as follows:

> MR. GROSSMAN:
>
> * * * * * * *
>
> * * * that fresh beef lungs, meaning beef lungs that are sold fresh, are sold for human consumption throughout the United States, and particularly in the fol-

lowing cities, Chicago, Philadelphia, Baltimore, Buffalo, Detroit, St. Louis, Los Angeles, San Francisco, Miami, Cincinnati, and Pittsburgh. It is likewise agreed that the total sales of fresh beef lungs, as aforesaid, are equal in quantity to the total sales in New York City. In other words, if that isn't too clear, that the total amount of beef lungs, fresh beef lungs, sold throughout the United States equals the total amount sold in New York City.

JUDGE JOHNSON: That's very clear.

MR. GROSSMAN: That the chief use of all fresh beef lungs which are sold fresh in the United States is for human consumption, and that the said use for human consumption is not limited or restricted to one race or nationality.

Do you so agree?

MR. SCHWARTZ: We agree to that, if the court please.

MR. GROSSMAN: With that agreement the Government rests.

Government witness John Schmidt, sales manager of the select meats division of the New York Butchers Dressed Meat Co., a subsidiary of Armour & Co., testified that the production of fresh beef lungs in New York City was between 6 to 8 thousand per week; that such lungs were sold to the retail trade; to dog-food manufacturers; as fish feed; to fur-bearing farms; and for pharmaceutical purposes. The fresh beef lungs sold to retail butchers varied between 50 per centum in the winter to 30 to 35 per centum in the summer. About half of his retail accounts were to kosher butchers and the other half to nonkosher, but about 80 per centum of fresh lungs were sold to the kosher shops. The witness had no personal knowledge whether or not the fresh beef lungs sold to the retail butchers were for food purposes, but he was of the opinion that they were.

The witness further testified that the majority of the beef lungs were sent out from the plant daily although when demand falls off they were frozen. As to the lungs so frozen, the witness testified that they were sold to dog-food manufacturers, not to retail dealers. He gave the reason that the retail butcher preferred fresh beef lungs as follows:

X Q. To whom do you sell the frozen lungs?—A. Well, we sell them to dog food manufacturers.

X Q. You don't sell those to retail dealers?—A. No.

X Q. Why is that?—A. The butcher here prefers a fresh lung. There is abundant amount of them and he prefers fresh lungs. The package is put up in hundred pound cartons.

X Q. Which package are you talking about?—A. I'm talking about beef lungs when frozen. Surplus beef lungs are frozen. They are put up in hundred pound cartons and frozen solid. A butcher would have a terrific time. He'd have to defrost possibly the entire hundred pounds in order to get to one lung, or five lungs, or 20 pounds, or 50 pounds, whatever he required. He prefers his item fresh; the trade prefers it fresh.

The witness further testified that fresh lungs would spoil if not kept under refrigeration, and indicated that, when frozen, there was a change in color, as he stated that the color would not change in

5 or 6 hours or even 24 hours. However, he was not very familiar with the frozen product. The witness had eaten a dish containing beef lungs, which he called lung stew. However, he stated that it was not entirely beef lungs as it also contained beef hearts.

Government witness Frederick S. Frankel, president of the Regal Packing Co., which handled and packed beef products, testified that his plant produced from 2,400 to 3,000 pounds of fresh beef lungs a week, sold to retail butchers, variety meat distributors, and to dog-food operators. The witness stated that the cattle in his plant were slaughtered kosher, but some were slaughtered nonkosher, and that nonkosher beef lungs were sold to nonkosher retail butchers. The witness admitted that he does not sell frozen lungs and that his trade wanted the fresh lungs. Describing a frozen lung, the witness stated that it loses its pinkish, fresh color, and it shrinks in size, whereas the fresh lung is fresh looking in appearance, having a bright pinkish color. This witness had never eaten beef lungs but he had seen advertisements in two or three restaurants. Although the witness had never sold frozen beef lungs and had not eaten beef lungs, on redirect examination, Government counsel asked:

R. Q. Is there any basic difference with respect to edibility between a fresh and a frozen lung?—A. Offhand, I'm not—as I say I'm not too familiar with the frozen end. It's—from my own experience there wouldn't be any effect as far as the edibility is concerned. It can be—it could be eaten.

R. Q. The freezing would not detract from its edibility?—A. No, sir; I don't think so.

From such testimony, in the light of earlier statements of the witness, it is quite apparent that the witness was offering an opinion without any basis of experience.

Government witness Robert L. Eldredge, in charge of variety meats in the United Dressed Beef Co., division of Swift, testified that he handled all the edible byproducts of an animal for human consumption, including fresh beef lungs. When asked if such products are sold as meat, the witness answered that "They call them variety meat." The witness stated that lungs were "a seasonal thing" and that in the summer approximately 60 per centum would be sold to about 300 retail butchers and in the winter probably 95 per centum. The witness further testified that the only way he sells lungs is for human consumption. However, he did not enlighten the court concerning his knowledge of the use of the lungs either after they were sold to the retail butcher or after the retail butcher had sold them to the consumer.

Concerning his familiarity with frozen lungs, the witness testified that he had seen them. Based upon such knowledge, if one might call it knowledge of a subject, the witness was asked—

Q. Could you state to this court whether, based upon your knowledge, there is any basic difference between a fresh or a frozen lung with respect to their edibility?—A. They are edible.

Upon cross-examination, when read the definition of a meat byproduct, to wit, "Any edible part other than meat which has been derived from one or more cattle, sheep, swine, or goats," and then the definition of meat as the edible part of the muscle of cattle, etc., and asked under which definition lungs would fall, the witness answered that it would come under the definition of a meat byproduct, being a membrane.

The witness, when asked to describe the difference in appearance between a frozen and a fresh lung, testified that there was a difference in color and size for the reason that—

> Any frozen product, a lung particularly, when it's fresh it has a light color and it has a bloom to it. When it's frozen it loses that and turns somewhat dark, dark in color, sometimes purplish or dark red, and the moisture that was in it, some of it's been eliminated. When it's frozen, and in packing it in boxes, it shrinks.

The witness further stated that his retail trade wanted fresh lungs and that he did not sell any lungs to dog-food manufacturers.

Government witness Murray Bernstein, manager of the production of sausage in the kosher meat and provision business, handling only kosher meats, beef, veal, lamb, and poultry, including lungs, testified that he buys lungs from various slaughterhouses; that he was in the retail as well as the wholesale business; and that he sells edible fresh beef lungs in his store. He also testified that, in comparison to meats, he sells a very small quantity, about 20 pounds per week, but he knew personally that the lungs were bought for human consumption, and he had eaten them himself both in the home and in restaurants occasionally. He had noted beef lungs on menus in kosher restaurants.

This witness also answered in the affirmative when asked if he eats lungs as a meat dish; if he considered beef lungs meat; and if he sold beef lungs as meat; but, on cross-examination, the witness admitted that, when he sold the lungs as meat, the item was noted on his bills as lung and not meat; that it would come under the heading of meat, as distinguished from fowl, or sausage or provisions. As to his sale and use of beef lungs, the witness testified that the percentage of lungs as compared with other meats was about one-twentieth of 1 percent; and that he uses it in the manufacture of sausage at times. The witness also admitted that, when sold in the retail store to consumers, fresh beef lungs were demanded and they were supplied on order only; otherwise, such product was not bothered with. He also admitted that part of the beef lungs sold to consumers was for the use of dog or cat food.

Government witness Dominick Spaventa, employed at Rocco's Restaurant as an Italian chef, specializing in Italian dishes, testified that he made a dish known as "soufritti," in which he used veal lungs and veal heart, but that no beef lungs were used. He testified that there was a lot of difference between a veal lung and a beef lung;

that a beef lung is tough; that one could not use beef lung in making soufritti because it would be too tough to eat; and that he did not use beef lungs in any dishes he made.

Government witness John J. Slattery, employed by the Office of Price Stabilization of the United States Government as a business analyst in the food and restaurant division, testified that his duties included advising the legal and economic staff on any problems that come up on meat. He further testified that he had been in the meat business for 40 years, and with the Cudahy Packing Co. for 20 years, in charge of the beef and mutton departments, and in the manufacturing sections in the eastern division. The witness also testified that he recognized as edible variety meats the entrails, hearts, livers, sweetbreads, lungs, and melts; that articles such as lungs were sold for the manufacture of the cheaper grades of baloney, and in cheap hamburgers. In that connection, the witness stated that a lot of the big chain stores bought beef lungs for use in hamburger meat. The witness also testified that the term "offal," under which beef lungs, are classified, includes meats which come under the heading of variety meats, not the beef itself, but it is different from refuse.

On cross-examination, the witness testified that the beef lungs shown in exhibit C were fresh kosher beef lungs, which means that they have to be fresh from cattle killed within 72 hours. The witness admitted that beef lungs fell within the definition of the United States Department of Agriculture of a meat byproduct. The testimony of this witness concerning the difference between a fresh beef lung and a frozen beef lung as only that one was fresh and the other frozen showed that he was not familiar with the frozen product.

The witness also admitted that he had no idea as to the percentage of beef lungs sold by Cudahy which was for human consumption, and the percentage sold to mink farms, and for dog and cat food.

Government witness Ben Bienstock, restaurant owner on Delancey Street, testified that he ran a kosher restaurant and uses beef lungs as an appetizer and as a main dish; that the dish was lungen stew, and, in making it, he used between 100 and 150 pounds of lungs a week, both beef and calf lungs.

The witness admitted on cross-examination that he did not know how the lungen stew was prepared other than to say that it was cooked.

Government witness Sidney Zucker, headwaiter of Lou G. Siegel, Inc., testified that such restaurant was the highest class Jewish restaurant in the country. Although this witness was a headwaiter and not a cook, and although it was not shown what was the basis of his knowledge, he testified to the preparation of fresh beef lungs into various dishes, as an appetizer and a roast in three different forms, as a lungen, as a lungen stew, and as a lungen and miltz stew. He stated that it was prepared like any other meat, "as pot roast, as

veal, or any other meat"; that lungen stew is prepared like any other beef stew with vegetables in it; and that nothing, other than beef lungs, is used to make it a meat dish.

Such testimony has very little probative value, particularly in the light of other evidence in the record, contradictory thereto, by witnesses who had cooked the article.

As rebuttal witnesses, the plaintiffs examined Roy M. Cohen, editor and publisher of the Butchers' Advocate and Dressed Poultry Magazine, a magazine which covers a cross-section of the meat industry, including processors, slaughterers, wholesalers and retailers, and also farm and production information. The witness testified that his duties were to travel around the country, obtaining information on the food situation, particularly as applied to meats, meat by-products, and poultry. As to his background in the meat business, the witness testified that after college he entered the family business, a chainstore packing house and slaughtering business in meats and poultry, operating in New Jersey, New York, Pennsylvania, Connecticut, and Massachusetts; that he was in that business from 1907 to 1928. From 1928 to 1934, he was in the meat business, where he had experience in killing cattle, sheep, and lambs—every phase of the business in the slaughterhouse—and then went into the retail store organization, numbering 200 stores. In 1929, he was assistant to the president of Hygrade Food Products Corp., now the fifth largest packer in America. Then, he was in the retail chain store business and opened the first large supermarket in America, located in Elizabeth, N. J.

The witness testified that according to his experience the part of beef lungs produced in the United States used for human consumption was fresh, although when he was engaged as a consultant from 1942 to 1946, in running a large packing plant in Chicago, the lungs were sold all fresh to dog-food manufacturers, as such lungs were desirable in the fresh form over the frozen on account of the change in character the minute the lung collapsed; and that he had handled frozen lungs and was able to distinguish the difference between the fresh and frozen so far as food qualities were concerned.

Q. Well, what is the difference in the physical condition between a fresh lung and a frozen lung?—A. It's a spongy substance to start with. In the fresh lung it looks very beautiful and red and is inflated very much like a balloon, because we know the lung structure has air and water. When it is frozen it is deflated; it's flat as a pancake when put in frozen form. The lung itself is not a tender product. When you freeze it it hardens and therefore, in my opinion, no frozen lung could possibly be used for serving for human consumption. The color changes; it's gray, brownish cast, all because it's a flattened-out element now—call it element because I don't know what else to say.

Q. You think it would be too tough for human consumption?—A. I do. I don't think it's possible to put the water pressure through it and cook it to reinflate it.

The witness further testified that a lung "is beautiful, the fresh one, it's large, inflated," but that it was not inflated purposely in addition in order to test it. It is tested by the trachea test; that all fresh lungs are sold fresh as soon as possible because "dehydration sets in, discoloration sets in, and of course in the kosher division you are supposed to try and sell it the minute the carcass is killed"; that whereas the fresh lung would have what is called "bloom," the frozen lung may be brown, gray, or any other color.

The witness further testified that in his experience he had never sold, nor known of being sold, a frozen lung for human consumption; that such lungs are not used for any edible purpose for human consumption that he had ever heard of; and that the basis of his statement is that a lung, after it has been once deflated, cannot "be brought up to be used in cooking at all and the amount of lungs that are used in this country, the small percentage of lungs for human consumption, would have to be fresh." In that regard, the witness further testified that his statement was based on the way frozen lungs have been sold through the years and to the type of buyer:

X Q. But you just said that it could not be made edible. What is that statement based on?—A. That's based upon the fact that even a dog food manufacturer will pay more for a fresh lung than a frozen lung because when the lung is deflated it's usually ground and cut up for a different purpose entirely. They will pay more for any lung that they can buy fresh than they will for a frozen lung because even in the preparation of dog food it has a great advantage.

* * * * * * *

X Q. So that you don't know whether if you cooked a beef lung properly the normal length of time necessary it might become edible?—A. I wouldn't answer that question yes or no, but from my experience, from the structure of that lung after it's frozen, I don't see how anybody could cook it for human eating.

X Q. What is your experience with the structure of that lung after it's frozen?—A. Because I have cut them through and had this situation, we tried to sell frozen lungs—

X Q. What is your experience with the beef lung, not what you tried to sell, please.—A. Wait a minute. Even for fish hatcheries—

X Q. Look, I asked you a question, what did you do with that lung that convinced you it was not edible?

JUDGE EKWALL: He is trying to tell you, if you will give him half a chance.

A. I'm trying to tell you that for fish hatcheries when we cut a lung in two they couldn't even bring it up for fish food, and that shows—if you will take the texture of any item after it's frozen and before it's frozen, I don't care what the item is, there is something that happens, even if you freeze it at 40 below. Now, when you have no substance to start with, and there is no substance in the lung, no real substance, you have got nothing to finish * * * when that lung is flattened out to look like that, I don't know how it can ever be brought back to anything that any human would want to eat.

* * * * * * *

X Q. You don't know of your own knowledge? Please answer my questions, not your questions. You don't know, you don't possess any knowledge; you never tried to bring it back at all? Did you ever do that?—A. No. Nobody else has.

Walter Karwel, district superintendent of the Exchange Buffet Corp., a restaurant chain with 19 restaurants, testified that in his

division of 8 restaurants, serving 20,000 persons a day, dishes made from beef lungs were never served.

Counsel for the plaintiffs contends that the record before the court completely confirms the conclusion reached by the court in the *Mackay* case, *supra*, that lungs are not habitually eaten as food, and are not articles of everyday consumption, nor are they ordinarily known as, nor accepted as, one of the meats of commerce. In that connection, counsel for the plaintiffs points out that, as admitted by the Government witnesses, the lungs used for human consumption were fresh lungs, and the agreement between counsel concerning the lungs which were eaten for human consumption referred exclusively to fresh lungs. It is further contended, therefore, under the rule announced by this court in the *Mackay* case, *supra*, that frozen lungs, clearly shown not to be used for human consumption, are not classifiable as meat under the tariff act.

Counsel for the Government stated that the sole issue before the court is whether or not the imported frozen beef lungs are to be classified as "meat" under the provisions of the Tariff Act of 1930.

In brief of Government counsel appear the following eight contentions:

1. We agree with this Court's judicial determination, predicated upon an exhaustive study of lexicographical authorities, judicial decisions, and Congressional intent "that the term 'meat' as used in the tariff act includes such portions of the animal as are habitually eaten as food, which are of everyday consumption, and which are ordinarily known as, and accepted as, a meat of commerce."

2. We contend that, for tariff purposes, frozen beef lungs and fresh beef lungs are one and the same article, it having been shown, beyond serious dispute, that the freezing of the article is merely for preservation.

3. We contend that the classification of the merchandise herein under paragraph 706 carries with it the presumption that said frozen beef lungs are such meat as are habitually eaten as food, which are of everyday consumption, and which are ordinarily known as, and accepted as, a meat of commerce.

4. We contend that the burden of proof is upon the plaintiff to overcome, by a preponderance of the evidence, the presumption that frozen beef lungs are habitually eaten as food, which are of everyday consumption and which are ordinarily known as, and accepted as, a meat of commerce.

5. We contend, based upon a studied review of the record herein, that the plaintiff has completely failed to sustain the burden of proof incumbent upon it as set forth hereinabove.

6. We contend that the Government has clearly shown that beef lungs are habitually eaten as food and are of everyday consumption by presenting to this court clear, certain, and convincing evidence that a very substantial amount of beef lungs is consumed daily throughout the United States by a large and varied segment of our population.

7. We contend that the Government has clearly shown, by sound and convincing testimony, that beef lungs are ordinarily known as, and accepted as, a meat of commerce, by every class of people who, in the normal and usual course of events, come in contact with it in any manner whatsoever, namely, meat

slaughterers and packers, wholesale and retail butchers, restaurateurs, and Mr. and Mrs. Public, the ultimate consumer.

8. We finally contend that it is reasonably certain and evident that it was the intent of Congress in the use of the term "meats," while enacting paragraph 706, to refer to importations such as that at bar.

In the pending case, the agreed statement of the facts, entered into by counsel for the plaintiffs with counsel for the Government, was motivated apparently, on the part of the plaintiffs, because of the indication by Government counsel to demand trials upon the issue in many ports throughout the United States which would prolong the final decision to some time in the distant future. In such agreement, the overwhelming testimony in the incorporated case, to the effect that beef lungs were chiefly used in the manufacture of dog and animal feed, was contradicted insofar as it pertained to fresh beef lungs. Even though the additional testimony of Government witnesses in the case at bar utterly fails to establish that fresh beef lungs are used chiefly for food purposes, or, in fact, establishes that such use is little more than fugitive, under decisions of the courts, so numerous and well known that reference thereto is unnecessary, the court is bound to accept such agreed statement in preference to the preponderance of evidence to the contrary.

Government counsel's several contentions are mainly predicated upon the stipulated facts when considered with his second contention that there is no difference between a fresh and a frozen lung. The evidence in this case, however, establishes without contradiction that there is a vast difference between fresh beef lungs and frozen beef lungs, first, in appearance; second, in texture; third, in quality; and, finally, in the use to which the frozen beef lungs are exclusively placed. There is an absence of credible evidence in the record to establish that a frozen lung was ever eaten or sold for purposes of human consumption.

As a matter of fact, documentary evidence, other than the exhibits contained in the incorporated record, tends to contradict the Government's contention that beef lungs, including the frozen as well as the fresh, are chiefly used as a food for human consumption.

Counsel for the Government introduced as an illustrative exhibit, marked defendant's exhibit A, the National Provisioner pamphlet of the daily market and news service, showing that under the heading "BEEF VARIETY MEATS," among other items, lungs and melts are listed, and also a National Provisioner booklet, defendant's exhibit B, which lists lungs and melts on page 30 thereof, under the heading "BEEF PRODUCTS." Government's exhibit C, heretofore referred to, is a ceiling-price sheet for kosher beef issued by the Office of Price Stabilization. Under the heading "KOSHER VARIETY MEATS" and the subheading "Kosher Beef," it lists lungs and melts. It might also be noted that

exhibit A notes the prices of dressed calves, carcass cattle and bulls, as well as boneless processing beef and packer hides, and exhibit B notes the prices of carcass beef and steer beef cuts.

Counsel for the plaintiffs offered in evidence a publication entitled "Agricultural Statistics, 1951," issued by the United States Department of Agriculture, referring particularly to tables No. 429 and 432, marked in evidence as exhibit 5. According to these tables, the total number of cattle slaughtered in the United States in 1950 was 18,642,000. Of this number, 507,300 were slaughtered in New York State. It is also noted that table 430 indicates that, in the year 1950, 370,000 cattle were slaughtered under Federal inspection in the New York City area, including Jersey City and Newark, N. J. The total number of cattle in the United States slaughtered under Federal inspection numbered 13,103,000. Therefore, the ratio of cattle slaughtered under Federal inspection in the New York area is less than 3 per centum. While additional animals are slaughtered commercially, the percentage remains the same. (Compare table No. 432.) The testimony in this case establishes that the beef lungs sold in New York City originate in that area. It is also clear that all of the beef lungs originating in New York City were not used for purposes of preparing food dishes for human consumption. In fact, outside of the agreed statement of facts as to fresh beef lungs, there is nothing to show that even a minor proportion of the beef lungs produced is used for human consumption. However, accepting the agreed statement of facts as evidence that the quantity sold of fresh beef lungs in the New York area is chiefly used for human consumption, and that an equal quantity sold throughout the remainder of the United States is chiefly used for human consumption, it remains as a fact, according to the statistics heretofore noted, that not as much as 6 per centum of beef lungs, as a whole, are consumed as food.

If the Government were to rely solely upon its second contention that fresh beef lungs and frozen beef lungs were one and the same thing, it is abundantly clear that the less than 6 per centum of fresh lungs, used for human consumption, would not bring beef lungs, as a whole, within the class of such portions of cattle as are habitually eaten as food. And, further, that such small portion of the whole as is used as food would not come within the class of food which is ordinarily known as, and accepted as, a meat of commerce.

However, the product before the court in this case consists of frozen beef lungs and not fresh beef lungs. The evidence clearly establishes a clear-cut difference between the two products. It is well settled that merchandise is to be classified according to its condition when imported. *United States* v. *Yardley & Co., Ltd.*, 16 Ct. Cust. Appls. 499, T. D. 43226; *Leonard Levin Co.* v. *United States*, 27 C. C. P. A. (Customs) 101, C. A. D. 69. See also *Oy Wo Tong Co.* v.

*United States,* 5 Cust. Ct. 70, C. D. 372, wherein certain Chinese commodities were held to be inedible and classifiable as drugs. The court noted (p. 75):

> * * * It is true that some of them [the witnesses] testified that certain of the exhibits were used as food in their fresh form. However, we must consider the merchandise before us as it appears in the condition as imported, i. e., dried. * * *

It has been held that beef livers are normally edible and are classifiable as meat. *United States* v. *Swift & Co.,* 13 Ct. Cust. Appls. 542, T. D. 41428; *F. W. Myers & Co., Inc.* v. *United States,* 29 C. C. P. A. (Customs) 30, C. A. D. 167. However, in *United States* v. *Judson-Sheldon Corp.,* 37 C. C. P. A. (Customs) 89, C. A. D. 424, it was held that beef livers, imported from Argentina, which United States authorities had found to be, in fact, unfit for human consumption were classifiable as drugs and not as edible animal livers. Such livers, in contrast to those involved in the *Myers* case, were held not to belong to the class and kind of beef livers used in this country for food purposes. In the instant case, according to the evidence presented, *frozen* beef lungs are not, in fact, used for human consumption and, therefore, they do not belong to the class and kind of beef lungs which, to some extent, are so used.

On the record presented, we find that the percentage of beef lungs used for human consumption in this country is a minor one, and there is no evidence before the court to establish that *frozen* beef lungs are used for human consumption. Therefore, in accordance with the authorities cited in *W. F. Mackay Estate* v. *United States, supra,* we hold that the imported merchandise, frozen beef lungs, melts, and spleens, was not properly classified by the collector as "meat." There being no specific provision therefor, it is classifiable as a raw or unenumerated unmanufactured article, dutiable at 10 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930, as to the items entered prior to January 1, 1948, and at 5 per centum ad valorem under said paragraph, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as to the items entered thereafter.

Judgment will therefore be entered in favor of the plaintiffs directing the collectors to reliquidate the entries and to refund duties in accordance with law.