(C.D. 2254)

Norman G. Jensen, Inc. *v.* United States

United States Customs Court, Third Division

(Decided May 8, 1961)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff. *William H. Orrick, Jr.*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges

DONLON, Judge: These two protests have been consolidated for trial. The merchandise of both protests is described as horsemeat. It was imported from Canada. There are certain differences in the merchandise of the two entries, as imported, and it is asserted that these differences are relevant to tariff classification of the merchandise.

The horsemeat of protest 59/29912 included both fresh and frozen horsemeat, but none of it had been decharacterized. All of the horsemeat of that protest was classified by the collector under paragraph 706 as meat, not specially provided for, and charged with duty at the modified rate of 3 cents per pound. As to this merchandise, it is plaintiff's claim that this is not meat, in the tariff sense, and that it is, instead, a nonenumerated unmanufactured article which is dutiable, under the GATT modification of paragraph 1558 (T.D. 51802), at 5 per centum ad valorem.

The horsemeat of protest 59/29913 is different from the horsemeat of protest 59/29912. This horsemeat is fresh, but it was decharacterized before importation. That is to say, charcoal was added to the fresh horsemeat in manner and quantity sufficient to change its "character."

*Atlas Canning Company, Inc.* v. *United States*, 41 Cust. Ct. 242, C.D. 2047, was decided November 26, 1958. The horsemeat of the *Atlas* litigation was found to be decharacterized and was held classifiable as a nonenumerated manufactured article dutiable, under the Torquay modification of paragraph 1558 (T.D. 52739), at the rate of 10 per centum ad valorem. The decharacterized horsemeat of protest 59/29913 was liquidated September 17, 1959, some 10 months after the *Atlas* decision. Pursuant to that decision, the collector classified the decharacterized horsemeat of this importation as a nonenumerated manufactured article and charged it with duty under modified paragraph 1558 at 10 per centum ad valorem. Plaintiff claims, as to the decharacterized horsemeat of protest 59/29913, that decharacterization is not manufacture, and that classification should be as a nonenumerated unmanufactured article, with duty as such at the modified rate of 5 per centum ad valorem.

This was also one of the several claims advanced by the *Atlas* plaintiff. The claim was there overruled. The issue presented to us in protest 59/29913 is tantamount to a retrial, by a different plaintiff, of an issue that has already been decided adversely to plaintiff's claim.

Defendant argues that the *Atlas* decision should be reaffirmed as to the decharacterized horsemeat of protest 59/29913. Plaintiff argues that neither the cutting of the meat, nor the addition of charcoal to it, constituted a process of manufacture within the purview of paragraph 1558. The court is asked, in effect, to reexamine its prior decision and to sustain here a protest claim similar to the claim that was overruled in the *Atlas* case.

The court may, in its discretion, consider anew a question previously decided, notwithstanding the rule of *stare decisis*. *Hertz* v. *Woodman*, 218 U.S. 205. However, this discretion should be exercised carefully, as we pointed out in *Atalanta Trading Corp.* v. *United States*, 37 Cust. Ct. 149, C.D. 1815. "At the very least, the court should balance the consistency and uniformity of decision, mentioned as desirable by the Supreme Court in the *Hertz* case, *supra*, against such scrutiny of the facts and issues in a later case as may distinguish it from the earlier case or point up the error of that decision." *Atalanta, supra*, at page 151.

The record now before us describes, as to the horsemeat of protest 59/29913, a method of processing to produce decharacterization which is somewhat different from the processing that was described in the *Atlas* case. This different evidence may or may not be such as to cause us to arrive at a different result. However, it is evidence which, in our opinion, merits judicial review.

The official papers are in evidence. There was extensive testimony. Certain exhibits were introduced. Much of the record in the consolidated cases deals with the issue raised in protest 59/29912, as to whether fresh or frozen nondecharacterized horsemeat is meat, in the tariff sense of paragraph 706. *That* is not an issue in protest 59/29913. We shall proceed first to dispose of the issue argued in protest 59/29913, namely, whether the decharacterized fresh horsemeat of that importation, conceded by both parties to be a nonenumerated article and, hence, to be classified under paragraph 1558, is a manufactured article or an unmanufactured article, in the sense in which those terms were used by Congress in enacting paragraph 1558.

The uncontroverted evidence as to the horsemeat of protest 59/29913, is that the meat was processed in Canada by Alsask Processors, Ltd., a subsidiary of Quaker Oats Co., Chicago, for whose account the horsemeat was imported. The horsemeat consists of both front quarters and trimmings.

In the processing of the horsemeat by Alsask, two cuts were removed from the front quarters. These cuts were not included in the imported merchandise. They are the cuts known as the "shoulder clod" and "spencer roll." After these two cuts had been removed from each front quarter, the remainder of the front quarters were weighed, tagged, and stacked in a rail car for shipment. At the time when these quarters were being stacked in the car, powdered charcoal was sprinkled over the meat, row after row, in the ratio of about one-half of 1 ounce of powdered charcoal to each 100 pounds of meat.

The "shoulder clod" and "spencer roll" from each of the front quarters, and five cuts taken from each of the hind quarters, were regarded by Alsask as food items for human consumption. All these cuts of the horsemeat were sold by Alsask for export from Canada

to Europe. None of those cuts was sold for export to the United States.

Alsask trimmed off the excess pieces, loose ends, fatty portions, muscle tissue and tendons, of the cuts destined for the European market. These are the trimmings of the importations now before us. The trimmings were placed in sacks holding 150 pounds each. Charcoal was sprinkled over each layer of the sacked trimmings of protest 59/29913, in the same ratio as was used to decharacterize the stacked front quarters.

The resulting decharacterized horsemeat, front quarters and trimmings, was imported into the United States by the processor's parent corporation, Quaker Oats, to be used in the manufacture of dogfood. Plaintiff's witness testified that, for such use, decharacterization is undesirable; and that horsemeat was decharacterized in Canada only to give a black and dirty appearance to the horsemeat so that it would not be subject to duty in the United States at the meat rates. The certifications of the Department of Agriculture of the Dominion of Canada, part of the official papers before us, support the view that if and when horsemeat has been decharacterized with pulverized charcoal it is no longer "sound, healthful, wholesome and otherwise fit for human food . . . ." That is, its "character" has been changed, which is stated to be the purpose of the processing.

It is plaintiff's argument, as to the decharacterized horsemeat, that a process which does not advance an article toward its ultimate use, or improve it, is not a process of manufacture; that the record adduced here establishes that decharacterization did not advance the horsemeat toward its ultimate use as dogfood, or improve it; and, hence, that classification should be as a nonenumerated unmanufactured article.

Accepting plaintiff's statement, as thus summarized, as to the facts of record (for it appears to be accurate), the question is one of law. Did the described process change this nonenumerated article from an article which is "raw or unmanufactured" to one which is "manufactured, in whole or in part," within the intention of Congress as expressed in paragraph 1558? Defendant believes that it did.

In support of its contention, plaintiff cites several cases in which competition in classification was between two enumerated provisions of the tariff act, or between an enumerated provision and the non-enumerated provision of paragraph 1558. Only one case was cited in which the competition was the same as we have here, namely, between the nonenumerated manufactured provision of paragraph 1558 and the nonenumerated unmanufactured provision of that same paragraph.

That case is *Quong Lee & Co.* v. *United States*, 20 C.C.P.A. 192. In the *Quong Lee* case, the nonenumerated article was Chinese birds' nests. They were cleaned before shipment to the United States.

Cleaning is all that was done to the birds' nests, according to the record. It was held that the described process of cleaning served merely to get the imported material (birds' nests) by itself, into a convenient commercial form for shipment, and that the mere cleaning away of dirt did not constitute manufacture either in whole or in part. That is to say, the cleaned birds' nests were a nonenumerated article, raw or unmanufactured. They were not, by virtue solely of the cleaning, a nonenumerated article that had been manufactured, in whole or in part.

Separating dirt from an article is not a process of manufacture, in the paragraph 1558 sense. The question here is the inverse of that situation. Here, the question is whether it is a process of manufacture, in the paragraph 1558 sense, when a foreign substance is added to an article for the purpose of changing the article into something that is, for tariff purposes, a different article than what it would be but for the addition of this foreign substance.

The briefs of counsel cite no cases that raise precisely this issue, save only the *Atlas* case, and our independent research discloses none. There are, however, precedents that are useful in arriving at a decision.

In general, it is the well-settled tariff rule that a process which changes an article into a different article constitutes manufacture of the article. *Kleinberger & Katz* v. *United States*, 12 Ct. Cust. Appls. 571; *United States* v. *Wilkinson Process Rubber Sales Corp.*, 22 C.C.P.A. (Customs) 60.

While cases are relatively rare in which merchandise has been deliberately deteriorated, before importation, for the purpose of avoiding duty at a higher rate than the rate that would be applicable to the merchandise if it were imported in its undeteriorated condition, the practice is not wholly novel.

In *Merritt* v. *Welsh*, 104 U.S. 694, the Supreme Court had before it a tariff litigation concerning sugar that had been treated before importation so that it would be of a darker color than a sugar of its grade would be unless so treated, and this was done in order that it might not be subject to duty at the higher duty rate laid on light-colored sugars. There was no claim of fraud or deception, as there is none here. A majority of the justices held that under existing legislation it was the color of the sugar, as imported, which fixed the duty rate; and that even though foreign matter was introduced into the sugar for the express purpose of simulating the darker color of a lower grade of sugar, the remedy for such obvious duty avoidance lay with Congress, not with the courts. (Congress long since accepted this Court challenge, changing the tariff standard for duty on sugars from that of color to a test of chemistry, i.e., the polarization test.)

The *Welsh* case, *supra*, is not especially pertinent to the issue now before us, save as it indicates clearly that the deliberate deterioration of an imported article in order to change its duty status will successfully effect the desired change. That is to say, a deliberately deteriorated article may be changed into something for duty purposes which it would not be but for the act which effected the deterioration.

It is well established in customs law that there are recognizable distinctions between an article, manufactured, on the one hand, and the process of manufacture, on the other hand; and between preparation and manufacture. Cases are numerous, and it is unnecessary to cite them here. Suffice it to say at this point, that a process of manufacture may be significantly slighter in its nature, and in the change which it makes in the processed article, than that required for the production of a manufactured article; and, also, that while preparation for an intended use in general connotes, in the tariff sense, advancement toward that use, a process of manufacture may result in change that is unrelated to a particular use or uses.

It is axiomatic in the law that judges decide only the cases that are before them for decision. Nonetheless, they may, and sometimes do, use opinion language which, selectively cited, might appear to hold that a particular decision has laid down a broader rule than the facts of the case support. *Dicta* are not precedents. No case holds anything beyond the scope of its own facts.

We proceed to consideration of the cases cited in plaintiff's brief in support of its argument that the decharacterized horsemeat, processed in the manner here described, is not manufactured, but is raw or unmanufactured.

In *Border Brokerage Co.* v. *United States*, 43 Cust. Ct. 231, C.D. 2132, the collector liquidated frozen ground shrimp shells as a nonenumerated manufactured article under paragraph 1558. Plaintiff's protest did not claim classification as a nonenumerated unmanufactured article under paragraph 1558. That competition, therefore, was not before the court. What the plaintiff claimed in the *Border Brokerage* case was, alternatively, (1) that the frozen ground shrimp shells should be classified under paragraph 1738 as shells which have not been "sawed, cut, flaked, polished, or otherwise manufactured, or advanced in value from the natural state"; and (2) that the frozen ground shrimp shells should be classified under paragraph 1555 as waste, not specially provided for.

The first claim was not argued. The court found it had been abandoned. It was dismissed.

As to the claim that the frozen ground shells were waste, the court found that the issue was whether the preimportation grinding of shells which concededly were waste before they were ground, sufficed to take

the shells out of the *eo nomine* waste provision of paragraph 1555 and throw them into the nonenumerated provision of paragraph 1558. The court pointed out the governing principle in such cases.

As we did in the *Tower* case [*C. J. Tower & Sons* v. *United States*, 36 Cust. Ct. 282, C.D. 1787], we again observe that when competition is between an enumerated classification and one that is nonenumerated, the enumerated classification will ordinarily prevail unless the evidence takes the merchandise out of the enumeration. The evidence here, as in the *Tower* case, does not take these shells out of the enumerated classification. [*Border Brokerage, supra*, at p. 235.]

Here, the competition is *not*, as it was there, between an enumerated classification and one that is nonenumerated. There is no need to weigh whether, as to the decharacterized horsemeat, processing took the meat out of an enumerated provision, for defendant concedes that it did so. We have before us now a competition between the two nonenumerated classifications of paragraph 1558. The legal problem is not the problem which the court dealt with in the *Border Brokerage* case.

*C. J. Tower & Sons* v. *United States*, 36 Cust. Ct. 282, C.D. 1787, mentioned in our consideration of the *Border Brokerage* case, *supra*, was a case concerned with classification of merchandise described as cereal offal feed. The collector had liquidated the merchandise as a nonenumerated manufactured article under paragraph 1558. There, as in the *Border Brokerage* case, plaintiff made no claim that the merchandise should be classified as a nonenumerated unmanufactured article under paragraph 1558. Plaintiff made two alternative claims: (1) That the merchandise should be classified under paragraph 730 as byproduct feed obtained in milling cereals, or (2) that it should be classified under paragraph 1555 as waste.

On the ground that this product was obtained by a process other than the milling of cereals, the claim under paragraph 730 was overruled. Congress has, in precise language, limited the paragraph 730 byproduct provision to those byproduct feeds "obtained in milling wheat or other cereals."

As in the later *Border Brokerage* case, the court held, in this *Tower* case, that what was concededly waste before it was ground, the grinding being done solely in order to make shipment more convenient, was not thereby taken out of the *eo nomine* waste provision of paragraph 1555.

In *Atlas Canning Company, Inc.* v. *United States*, 41 Cust. Ct. 242, C.D. 2047, the decharacterized horsemeat had been liquidated as meat, fresh, chilled, or frozen, not specially provided for, under paragraph 706.

Plaintiff claimed classification under paragraph 1558 as a nonenumerated article and, alternatively, as such an article, manufactured or unmanufactured.

A considerable part of the opinion in the *Atlas* case was devoted to an issue that is not before us as to the decharacterized horsemeat of protest 59/29913, now under consideration. That issue, an issue which we shall treat later in connection with the undecharacterized horsemeat of protest 59/29912, was the competition between the *eo nomine* meat specification of paragraph 706 and the nonenumerated provision of paragraph 1558. We treated that issue as follows:

> It is not necessary here to consider whether the processes to which the natural horse meat has been subjected would or would not take it out of some *eo nomine* provision, for we have held that this article is not enumerated in the tariff act. Our consideration is whether, being unenumerated and, hence, dutiable under paragraph 1558, it is raw or unmanufactured, or manufactured, in whole or in part.

On the facts before us in the *Atlas* case, we held that the decharacterized horsemeat was manufactured, in part. There, the record showed that the horsemeat, after boning and cutting, had been deeply slashed, almost (but not quite) through the meat at intervals of 1½ to 2 inches, and that these cuts were treated with charcoal, which penetrated the meat and caused it to change color from red to black.

Here, the record shows no slashing of the meat. It shows, rather, that the cut front quarters and trimmings were treated by sprinkling powdered charcoal on the meat surface, which caused the meat to change color (as in the *Atlas* case) to black. Plaintiff makes no claim that this process did not constitute decharacterization of the horsemeat. Indeed, plaintiff's witness Ratcliffe testified, on cross-examination, that it is his understanding that this decharacterization process changed the appearance of the horsemeat, and also that it changed the "substance of the outer surface of the product." (R. 21.) This is the same witness who, on direct examination, stated it was his understanding that the purpose of decharacterization was to change tariff classification. Since Mr. Ratcliffe was manager of the Edmonton plant of Alsask Processors, Ltd., presumably he was qualified to have an understanding with respect to the processing.

We proceed to consider whether plaintiff has developed a record, or presented arguments, which lead us here to a holding different from that in the *Atlas* case.

We reject the notion that an article that has been processed in a manner which does not advance it in value, or toward an intended use, necessarily remains a raw or unmanufactured article under paragraph 1558. See *United States* v. *Brunswick Radio Corp.*, 22 C.C.P.A. (Customs) 346.

In the *Brunswick* case, phonograph records were processed in Canada from a recording compound product which, in the form of substantially square sheets about the size of phonograph records, had been exported from the United States. As a result of the manufacturing process, a number of records were defective. The defective

records were broken into comparatively small pieces, returned to the United States, and claimed free of duty as American goods returned, without having been advanced in value or improved in condition by any process of manufacture or other means, under paragraph 1615 of the Tariff Act of 1930. The collector classified the defective records as waste, not specially provided for, under paragraph 1555. The defective records were, in fact, valued at about 50 per centum of the exported recording compound.

Our appeals court there stated, at page 350, as follows:

The process of converting the exported material into phonograph records is a manufacturing process. The resultant of that process, whether it be defective or otherwise, is a manufactured article having a new name, character, or use. Of course, if the phonograph records were so defective that they were wholly unfit for use as such, they might, as they were in the case at bar, be used as scrap material for remanufacture into recording compound. Nevertheless, such scrap material is the resultant of a manufacturing process in Canada. It was not produced by a "process of segregation or elimination," as was the "insoluble residue" held to be American goods returned in the case of *United States* v. *Tower & Sons, supra* [9 Ct. Cust. Appls. 135]. We conclude, therefore, that the involved merchandise is not the American product exported from the United States, merely changed in condition, but, on the contrary, is a wholly different article, produced by manufacturing processes in Canada. Accordingly, *the mere fact that it is worth less than the material out of which it was manufactured is not of consequence.* [Emphasis supplied.]

On several occasions, our appeals court has stated that in order to constitute a process of manufacture, it is necessary only that the article be so processed as to remove it from its crude or primary state, even though it remains a variety of the original material. *United States* v. *C. J. Tower & Sons*, 44 C.C.P.A. (Customs) 1, C.A.D. 626; *Chas. H. Demarest, Inc.* v. *United States*, 44 C.C.P.A. (Customs) 133, C.A.D. 650; *United States* v. *Charles H. Demarest, Inc.*, 45 C.C.P.A. (Customs) 109, C.A.D. 682.

The decharacterized horsemeat here is no longer in the crudest form, or in the most primary state, in which it could be sold as an article of commerce. We refer to plaintiff's consolidated case 59/29912, protesting classification of fresh and frozen horsemeat, nondecharacterized. The fact that nondecharacterized horsemeat would be preferable to decharacterized horsemeat, avoiding a housekeeping problem in the American factory when it is processed into dogfood, was a personal consideration with plaintiff, considering its own best interest.

After careful review of the record now before us, the arguments plaintiff has advanced, and the authorities cited, we are not impressed that the decision in the *Atlas* case, *supra*, is incorrect or that it is inapplicable here. The rationale was stated in our opinion there, and it is worth repeating here.

The precedents most useful are those cases in which the competition in classification was between the raw or unmanufactured and the manufactured categories of paragraph 1558. Such a case was *Werner G. Smith Co. et al.* v. *United States*, 40 C.C.P.A. (Customs) 90, C.A.D. 503. Writing for the court, Judge Johnson stated the issue succinctly, at page 99, as follows:

> * * * The sole basis of distinction between the 10% and 20% duty rates in that paragraph depends on whether the import is unmanufactured, or manufactured, in whole or in part. Thus, it seems clear to us that there is no alternative but to regard the process of producing the imported merchandise as a, if not the, decisive factor in determining which of the two rates is applicable.

Relying on cited precedents, our appeals court held that the article of the *Smith* case, tall oil, was "produced by a manufacturing process comprising the chemical conversion of the fatty acid soaps in the skimmings by acidulating them" and, hence, the tall oil was an unenumerated *manufactured* article within the purview of paragraph 1558, whether or not its ingredients were only those that occur naturally in the pine tree from which the oil is derived. *Werner G. Smith Co. et al.* v. *United States, supra*, page 99.

Whether the charcoal process effected chemical changes in the natural horse meat, the record does not show, nor is it necessary for us to decide that issue. What had been "raw or unmanufactured" was made into something different, for importation as that different (or decharacterized) article, to be further processed here into dog food. It is not "raw or unmanufactured." It is "manufactured," in part at least, within the meaning of paragraph 1558. [Emphasis copied.] [Pp. 244, 245.]

The imported merchandise of protest 59/29912 was processed in the same manner as the merchandise of protest 59/29913, down to the point in processing at which the latter was decharacterized by the process of adding charcoal to the meat. The horsemeat of protest 59/29912, like that of protest 59/29913, consists of the front quarters (less the cuts called "shoulder clod" and "spencer roll") and trimmings. Some of the horsemeat of protest 59/29912 was imported fresh; some was frozen when imported. None was decharacterized.

While the horsemeat of protest 59/29913 had been decharacterized and, by certificate of the Canadian Department of Agriculture, was, by such decharacterization, made unfit for human food, it appears from the record before us that the nondecharacterized horsemeat of protest 59/29912 was edible, that it was sold and exported from Canada under laws applicable to the sale and export of meat, and that it was entered into the commerce of the United States subject to regulatory requirements of the United States for the importation of meat.

Congress has authorized regulation of the importation of meat of all kinds into the United States and the disposition of imported meats within the country subsequent to importation, in tariff acts over a period of years. In the Tariff Act of 1922, this expression of congressional intention was found in paragraph 706. In the Tariff Act of 1930, it is found in section 306(b), as follows:

(b) No meat of any kind shall be imported into the United States unless such meat is healthful, wholesome, and fit for human food and contains no dye, chemical, preservative, or ingredient which renders such meat unhealthful, unwholesome, or unfit for human food, and unless such meat also complies with the rules and regulations made by the Secretary of Agriculture. All imported meats shall, after entry into the United States in compliance with such rules and regulations, be deemed and treated as domestic meats within the meaning of and subject to the provisions of the Act of June 30, 1906, commonly called the "Meat Inspection Amendment," and the Act of June 30, 1906, commonly called the "Food and Drugs Act," and Acts amendatory of, supplementary to, or in substitution for such Acts. [19 U.S.C. § 1306(b).]

The regulations adopted under congressional authority expressed in section 306(b) specifically include Canada as one of the eligible countries from which *horsemeat* and horsemeat food products *may be imported into the United States*, and provide as follows:

§ 29.13 *Imported horse meat and horse meat food products to be handled and transported as domestic.* All imported horse meat and horse meat food products, capable of being used as food for man, after admission into the United States in compliance with this part shall be deemed and treated and shall be handled and transported as domestic horse meat and horse meat food products, and shall be subject to the provisions of Parts 1 through 29 of this subchapter which are applicable to domestic horse meat and horse meat food products, and to the provisions, prohibitions, and penalties of the Horse Meat Act and the Meat Inspection Act as made applicable to horse meat and horse meat food products. Imported horse meat and horse meat food products which have been inspected, passed, and marked under this part may be transported from one State or Territory or the District of Columbia to another State or Territory or the District of Columbia, or to any place under the jurisdiction of the United States, or to a foreign country, only upon compliance with all of the provisions of Part 25 of this subchapter, except §§ 25.10 and 25.11, as if said provisions referred to horses, horse meat and horse meat food products. [9 C.F.R. § 29.13.]

Domestic and imported horsemeat is subject to the same meat inspection as are cattle, sheep, swine, goats; and the meat of those animals. (9 C.F.R. §§ 29.9, 29.12.)

It is required that with importations of horsemeat and horsemeat food products there shall be, in prescribed form, a foreign horsemeat inspection certificate, certifying the meat as fit for human food. (9 C.F.R. § 29.11.) Such a certificate, from the Canadian authorities, accompanied the fresh and frozen horsemeat of protest 59/29912. The official papers do not show what action was taken by the United States Department of Agriculture, but it is to be assumed that this importation entered into the commerce of the United States lawfully and in compliance with applicable regulations. *United States* v. *Henry W. Peabody & Co.*, 40 C.C.P.A. (Customs) 59, C.A.D. 498. Illegality will not be inferred, as the basis of decision.

The argument which plaintiff adduces points up the fallacy of citing opinion language out of context. In *Atlas Canning Company, Inc.* v. *United States*, 41 Cust. Ct. 242, C.D. 2047, the merchandise

was *decharacterized* horsemeat. It was *not* untreated horsemeat, fresh or frozen, which is the horsemeat of protest 59/29912. The language of the *Atlas* decision can have no application broader than the facts to which it is related. It has not the force of precedent as to *nondecharacterized* horsemeat. Plaintiff's argument appears to indicate some cognizance of this limitation.

The other cases cited by plaintiff as authority for its contention that nondecharacterized horsemeat is not meat, for tariff purposes, are cases in which the litigated merchandise was something other than animal flesh, such as is commonly called meat. In the cited cases, the merchandise was animal offal, namely, beef lungs. *W. F. Mackay Estate* v. *United States*, 28 Cust. Ct. 73, C.D. 1391; *A. N. Deringer, Inc., et al.* v. *United States*, 32 Cust. Ct. 41, C.D. 1578.

Plaintiff argues that the judicial rule, which was applied to animal offal, necessarily requires that we find that animal flesh is meat only when it is an article commonly eaten by people of the United States at the time of importation.

Animal flesh is defined as meat. Animal flesh may be that meat which is called beef. It may be that meat which is called pork, or lamb, or veal. It may, also, be meat which is not *eo nomine* specified in the tariff act, that is, meat, not specially provided for. As indicated earlier, offal is not usually known in commerce as meat of the animal from which the offal derives.

Meat, in the tariff sense, has been held to include not only animal flesh, but also edible animal offal. Notwithstanding the sale of negligible quantities of certain offal for food, this court has held that such offal, imported for nonfood uses, is not meat when, under the law and regulations, it is not deemed edible. In the case of offal, the meat provision appears to have been limited judicially to such offal as is "edible," and what offal is "edible" has been further limited by this court to what is commonly used as food.

It is so widely known as not to require proofs that offal is not usually purchased as beef, or pork, or lamb, or veal, or as meat of some other animal. Offal, as an article of commerce, is known as livers, hearts, brains, lungs, or by other offal name. The tariff status of livers had been considered by our appeals court before the decisions of the court which plaintiff cites, *supra*. There are three cases of the higher court that should be considered here.

The first of these is *United States* v. *Swift & Co.*, 13 Ct. Cust. Appls. 542, decided in 1926. Fresh beef and calf livers were classified, under the 1922 act, as fresh beef and veal. Plaintiff claimed, alternatively, classification as a raw, unmanufactured article, not enumerated, under paragraph 1459 (the provision of the 1922 act corresponding to paragraph 1558, under which plaintiff here is claiming), or as meats, not specially provided for. The nonenumerated claim was overruled

below, on the ground that the merchandise was more specifically provided for elsewhere. The livers were held dutiable, not as beef or veal, but as meats, not specially provided for.

In *F. W. Myers & Co., Inc.* v. *United States*, 29 C.C.P.A. (Customs) 30, C.A.D. 167, decided in 1941, frozen beef livers were imported from Canada. These were classified by the collector as meats, not specially provided for, following the *Swift* case, *supra*. Plaintiff claimed duty-free entry for the livers as natural and uncompounded drugs of animal origin, under paragraph 1669 of the Tariff Act of 1930, or, alternatively, that the livers were dutiable under paragraph 34 as drugs, advanced.

It was established by competent proofs that the livers of the *Myers* case were imported from Canada for use by Lederle Laboratories, Inc., in the manufacture of products used in the treatment of pernicious anemia. The consumption entry had the following notation: "Frozen beef livers, inedible and unfit for human consumption (for medicinal purposes only)." Because the livers were not imported for food purposes, the United States Department of Agriculture permitted their delivery without inspection.

Our appeals court held the livers dutiable as meat, in an opinion that included the following:

> Clearly, beef liver is not a drug. It is meat and was so held by this court in *United States* v. *Swift & Co.*, 13 Ct. Cust. Appls. 542, T.D. 41428. That it possesses therapeutic properties and that the chief and only use of the merchandise herein was for therapeutic or medicinal purposes is not questioned. Even assuming that it were a drug, certainly, on the record, the imported beef liver is fit to be eaten as food. Its edibility is not questioned by appellant, except as hereinbefore set out.
>
> There is nothing in the record which even by inference can sustain the contention of appellant that the imported merchandise is an inedible drug. On the contrary, the evidence clearly shows that the imported beef livers are edible, even though it was necessary to comply with certain formalities if they were exported as food. The fact that the exporter did not seek to follow the necessary routine mentioned with respect to the certification of products intended for food purposes does not, of itself, render the goods any the less edible.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*
>
> It does not seem logical to us that, as the appellant argues, there is a distinction between meat which is edible in fact and meat which is edible only by reason of law. [Pp. 33, 34.]

In 1950, 9 years after the *Myers* decision, our appeals court decided *United States* v. *Judson-Sheldon Corp.*, 37 C.C.P.A. (Customs) 89, C.A.D. 424, in which frozen beef livers from Argentina were held duty free under the drugs provision of paragraph 1669, rather than dutiable as meats, not specially provided for, under paragraph 706. The difference between this case and the *Myers* case was the country of origin of the imported livers. All meat products from Argentina, with exceptions noted in the law and regulations and not including in the

exceptions frozen beef livers, such as the importation, are deemed, under our laws, as unfit for human consumption. The court said:

It is clear to us that the involved frozen beef livers can not properly be held to be edible. All meat products from Argentina, with the exceptions noted in the laws and regulations, are considered unfit for human consumption. That is not merely a fiction declaring something to be inedible merely by fiat of law. It is a finding by the duly constituted United States authorities that such proscribed importations are in fact unfit for human consumption. Therefore, it can be successfully contended that such meats are inedible even though the record discloses, as hereinbefore mentioned, that some of the liver had been cooked and eaten without ill effects.

We see no violent or strained meaning in our holding, such as was stated in the case of *Cruikshank* v. *United States*, 59 Fed. 446 (C.C.A. 2nd 1894), decided under the tariff act of 1890, and which is cited in the brief of appellant. Neither can we properly say that the imported merchandise is edible because it appears that some of it was eaten after cooking, as was held in the case of *United States* v. *Paul Puttmann, supra.* [21 C.C.P.A. (Customs) 135.]

The case of *F. W. Myers & Co., Inc.* v. *United States*, 29 C.C.P.A. (Customs) 30, C.A.D. 167, which is pointed out in the brief of appellant as being closely enough in point to be controlling here, is not apposite. There, as here, the subject matter out of which the issue arose was a shipment of frozen beef livers from Canada for use in the Lederle Laboratories in the manufacture of liver pharmaceuticals designed for treatment of pernicious anemia. In that case the liver could not be imported as food, unless before shipment from Canada a pure food label was applied to the package and a certificate issued corresponding to the number of the label, signed by an inspector of the Department of Agriculture, on which it was stated that the meat had been properly prepared under sanitary conditions.

It was not necessary to observe those requirements with respect to the merchandise in the *Myers* case, *supra*, for the reason that it was not imported for food stuff. The vital distinction between the facts in that case and the facts before us is that there frozen beef livers could be imported as food, while here such merchandise could not be imported except for pharmaceutical purposes, and the reason for the banning of importations, such as that involved here, is that it has been found as a fact that it is unfit for human consumption, and therefore can not be held to be edible. We stated in the *Myers* case, *supra*, that it did not seem logical to distinguish between meat which is edible in fact and meat which is edible only by reason of law. The reason for such statement is obvious from the facts in that case, and clearly is not pertinent under the facts of the instant case. [Pp. 93, 94.]

We find no difficulty in applying the principles of the decided cases to the facts now before us.

In the competition between the nonenumerated, or "catch all," provision of paragraph 1558 and an enumerated provision, here, paragraph 706, the nonenumerated provision may not be applied if the merchandise is more specifically enumerated elsewhere. Here, the competition is not between two different enumerations.

We hold that the nondecharacterized horsemeat of protest 59/29912 is meat, not specially provided for, dutiable under paragraph 706. On the record before us, this horsemeat is edible, both in fact and in law. Edible means "eatable" or "suitable to be eaten." *United States*

v. *Judson-Sheldon Corp.*, *supra*. Neither the fact that horsemeat is not included among the foods eaten by most residents of the United States, nor the fact that the merchandise of this importation was actually used as a component of dogfood, makes inedible at law what is edible in fact.

Our decision makes unnecessary a discussion of the extensive record plaintiff developed as to the meat eating habits of Americans. Nor is it necessary for us to assess the probative value of opinion polls. The minor use of horsemeat in the diet of the average American family, implicit in the reports and testimony of the experts, does not make this horsemeat of protest 59/29912 inedible. The cited decisions of our appeals court are to the contrary.

While doubt has been cast on the value of Summaries of Tariff Information prepared subsequent to tariff enactment, as an indication of congressional intention (*Dodge & Olcott, Inc.* v. *United States*, 45 C.C.P.A. (Customs) 113, C.A.D. 683), it may be noted in passing that, in the 1948 summaries (volume 7, part 1, p. 63), prepared at congressional direction, there is included in the enumeration of paragraph 706 articles "horse meat, whether fresh, chilled, or frozen . . . ." In view of the *Dodge & Olcott* case, we have not given weight to the 1948 summaries in reaching our decision.

The motion to consolidate these cases was not proper. The merchandise and the claims are different. What plaintiff evidently desired was to avoid repetition of certain testimony. This avoidance might have been more satisfactorily achieved by incorporation of a record, or parts of it, than by consolidation of cases involving dissimilar issues.

Both protests are overruled.

Judgment will be entered accordingly.