(C.D. 2479)

David G. Dalquest
Marvin Judd } v. United States

United States Customs Court, Third Division

(Decided September 22, 1964)

*Glad & Tuttle* (*George R. Tuttle, Jr.*, of counsel) for the plaintiffs.
*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before Donlon and Richardson, Judges

Donlon, Judge: The merchandise of these cases, which were consolidated for purposes of trial, is described as sea lion carcasses and sea lion livers, imported from Canada in June 1961. The merchandise was invoiced as fresh, chunked, eviscerated sea lion carcasses and fresh

sea lion livers, for use as food for fur bearing animals and not for human consumption.

The sea lion carcasses were assessed with duty at 3 cents per pound as meats, fresh, chilled or frozen, not specially provided for, under paragraph 706 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade (T.D. 52739); and the sea lion livers were assessed with duty at 1¼ cents per pound under the same paragraph, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade (T.D. 54108), as edible animal livers. The protests, as amended, claim that this merchandise is properly duty free under paragraph 1677 of the Tariff Act of 1930, as fish to be used for purposes other than human consumption; or, alternatively, that it is dutiable at 5 percent, or at 10 percent, ad valorem under paragraph 1558 of said tariff act, as modified, as nonenumerated articles, either unmanufactured (5 percent) or manufactured (10 percent).

The pertinent provisions of the tariff act, as modified, are as follows:

[Par. 706, as modified by T.D. 52739] Meats, fresh, chilled, or frozen, not specially provided for * * * _____ 3¢ per lb., but not less than 10% ad val.

[Par. 706, as modified by T.D. 54108] Meats, fresh, chilled, frozen, prepared or preserved, not specially provided for:
Edible animal livers, * * * _____ 1.25¢ per lb., but not less than 6% ad val.

Par. 1677. Fish imported to be used for purposes other than human consumption. [Free]

[Par. 1558, as modified by T.D. 51802] All raw or unmanufactured articles not enumerated or provided for * * * _____ 5% ad val.

[Par. 1558, as modified by T.D. 52739 and T.D. 52827] Articles manufactured, in whole or in part, not specially provided for * * * _____ 10% ad val.

At the trial plaintiffs called as their witness Mr. Marvin L. Judd, president of Monarch Marine Products, shipper of the imported merchandise. He testified that the business of his firm is the commercial hunting of sea lions and fur seals. He has been engaged in that business since 1959. He personally conducted these operations in the early years, and more recently he has been responsible for sales and the distribution of products. (R. 4.) He described the hunting operations. He said that after sea lions are shot, they are eviscerated in order to preserve the meat; that the heads, flippers, and hides are removed, to facilitate transporting the meat for processing; and that the carcasses are quartered, so that the men can handle them.

(R. 5, 22.) He explained that, since a sea lion carcass runs in weight up to 2,400 pounds, it is physically impossible for the men to move a whole carcass around in the hold of the ship. For that reason, to facilitate handling, the carcasses are quartered. (R. 5, 6, 23.) According to Mr. Judd, the term "chunked," as used in the invoices, indicates that the carcass has been quartered. (R. 6.)

Mr. Judd testified that nothing is added, and neither is the carcass ground before it is imported into the United States. (R. 23.) The approximate amount of commercial recovery, in terms of the gross weight of a sea lion, is 50 percent. (R. 23, 26.) The hides, flippers, and heads, taken together, account for 25 percent of the carcass weight; the backbone, rib structure, etc., consitute another 25 percent; and 50 percent of the carcass weight is the soft flesh that is used for mink feed. (R. 26.)

As to the sea lion livers, nothing is done to them prior to importation, other than removing them from the carcasses. (R. 25.) Both livers and carcasses are shipped in ice. (R. 25, 27.)

On importation into the United States, the carcasses are removed from the hold of the ship, and hung up in order that the meat may be trimmed off. (R. 10.)

After trimming, the meat is ground, frozen, and packed into polyethlene-lined paper bags. (R. 10, 11.)

The major purchaser of the ground sea lion meat is McCauley's, Inc., of Seattle, the business of which is the sale of bulk mink feed. (R. 9, 11.) McCauley's sells the packaged, ground sea lion meat to mink ranchers as mink feed. Small quantities are also sold directly by Mr. Judd's firm to mink ranchers in and around Bellingham, Wash. (R. 9). Mr. Judd said that in 1960, 1961, and 1962 he had sought to make sales to the dog and cat food industry, and had distributed samples of the ground sea lion meat which were used in manufacturing pet food. (R. 11, 12.)

Mr. Judd never has offered sea lion meat for sale for human consumption, and to his knowledge it has never been used as human food. (R. 12.) He said that he has handled sea lion carcasses since 1959, in quantities of 700 to 800 carcasses a year, and that to his knowledge he is the only commercial sea lion hunter in the world. (R. 14.) He has sold sea lion meat in Canada to the mink trade, and he has given samples to dog and cat food manufacturers in Vancouver. (R. 14, 15.) He has never heard of sea lion meat being used for human consumption in Canada. (R. 15.)

He and some of the members of the crew of the "St. Joseph" once tasted sea lion meat. They found that it had a fishy odor and a very distinctive wild flavor. (R. 15, 24, 25.) It was not palatable. (R.

15.) He has never seen or heard of Indians eating sea lion meat. (R. 15.)

Mr. Judd testified that the sea lion is a form of marine animal, closely akin to the fur seal. (R. 6.) It lives in the sea. It feeds on fish. (R. 16.) It comes ashore only to breed and pup. (R. 16, 17.) It does not feed when it is on the breeding rookery, where it may remain for as long as 2 to 3 months, living off its fat. (R. 17.)

Mr. Judd said that he had imported unquartered sea lion carcasses in 1960; but that he did not continue to do so, not only because the whole carcasses are difficult to handle, but also because the meat tends to spoil if the hide is left on. (R. 23, 24.)

Mr. David G. Dalquest, customhouse broker, testified that he handled entries at the port of Bellingham for Mr. Marvin Judd, from 1960 through 1962. (R. 28.) He has also made entries of edible meat through that port, and in such cases he has complied with the Government regulations as to imported meat. (R. 28, 29.) In making entries of sea lion carcasses, however, he did not ask any Government officials to examine the meat. (R. 29.) He does not know of any other entries of sea lion carcasses that have been assessed as meat. (R. 30.) Copies of previous entries, made between June 8, 1960, and July 11, 1960, at the port of Bellingham, were produced and received in evidence as plaintiffs' collective exhibit 4. (R. 30, 34.) They cover sea lion carcasses, fresh, whole, eviscerated, which were entered at 5 percent ad valorem under paragraph 1558 of the Tariff Act of 1930, as modified, as nonenumerated unmanufactured articles. It was stipulated by counsel that such entries were liquidated as entered, that is, at 5 percent under paragraph 1558. (R. 39.)

Mr. Harold H. Mitchell, of International Packers, Ltd., testified that he had engaged in selling and purchasing for his firm for 15 years. (R. 41.) His company deals in canned meats and in fresh and frozen meats from Australia, New Zealand, and South America. It has done 55 million dollars worth of business annually during the past 5 or 6 years. (R. 41, 43.) Mr. Mitchell has sold merchandise for his firm on the entire west coast, throughout the Midwest, and in the New York area and around Philadelphia. (R. 41, 42.) He has never sold any sea lion meat and has never heard of its being sold for human consumption, but he said it could have been used for pet food or for mink food. (R. 42.) He said that his firm sells only meats for human consumption, except for offal which may be used in the United States for dog food and which is also shipped to other parts of the world. (R. 43.) His firm does not handle all meats which are suitable for human consumption; but deals mainly in beef and canned meats, goat meat, lamb, and mutton, not much pork, and no horse meat. (R. 44.)

Plaintiffs introduced into evidence a report of the United States Department of the Interior, Fish and Wildlife Service, entitled "Ex-

perimental Harvest of the Steller Sea Lion in Alaskan Waters." (Exhibit 2.) This report described an experimental expedition conducted in 1959 by a commercial fishing company for the purpose of hunting sea lions, as a part of a study of the depredations of sea lions in the vicinity of fisheries. The sea lion meat and liver which were obtained were ground and packaged, and sold to fur farmers in the Pacific Northwest for use as mink food. The report suggests that such meat might also be marketed for use in zoos, as pet foods, and perhaps used in fish culture, dependent upon tests as to nutritional value and palatability and assurance of a stable supply of sea lion meat. (P. 11.)

The first issue is whether sea lion meat is "meat," in the sense in which that term is used in paragraph 706 of the Tariff Act of 1930. If it is not meat, for tariff purposes, then the next issue is whether it should be classified as fish under paragraph 1677 of said tariff act, or as an unenumerated manufactured or unmanufactured article, under paragraph 1558, these being the alternative protest claims.

The term "meat" has been defined as follows:

\* \* \* \* \* \* \*

3. The flesh of animals used as food \* \* \*. Commercially, in the United States, *meat* means the dressed flesh of cattle, swine, sheep, or goats, except where used with a qualifying word, as in *reindeer meat, crab meat.* [Webster's New International Dictionary, 2d edition (1958).]

1. The flesh of vertebrate animals used as food: sometimes limited, colloquially, to the flesh of mammals, as opposed to poultry, game, fish, frogs, turtles, and the like; as, butchers' *meat.* [Funk & Wagnalls New Standard Dictionary, 1956 edition.]

The edible part of the muscle of cattle, sheep, swine, or goats which is skeletal or which is found in the tongue, in the diaphragm, in the heart, or in the esophagus, with or without the accompanying and overlaying fat, and the portions of bone, skin, sinew, nerve, and blood vessels which normally accompany the muscle tissue and which are not separated from it in the process of dressing. It does not include the muscle found in the lips, snout or ears. [Meat Inspection Regulations, Department of Agriculture, 9 C.F.R. 1.1 (u).]

Meat is the flesh or edible offal of domestic animals used for food. It includes beef, pork, lamb, mutton, and veal. In a broad sense, the term meat may include poultry and game. \* \* \* [Encyclopaedia Britannica, vol. 15, p. 145.]

Whether or not a particular article of animal flesh is meat, for tariff purposes, has been before the courts many times.

In *Frankfeld & Co.* v. *United States*, 7 Ct. Cust. Appls. 296, T.D. 36805, pituitary glands taken from calves were used in the production of a watery liquid hypodermically injected in obstetric work. The record showed that these glands not only were unfit for human consumption, but that their sole and exclusive use was other than for human food. In the course of the opinion the court noted that paragraph 545, Tariff Act of 1913, provided that meats should not be admitted into the United States unless they are healthful, whole-

some, and fit for human food, and unless the regulations of the Department of Agriculture are complied with. The court then stated that this provision made certain what the intention of Congress was in using the tariff term "meats," namely, that they are the meats of every day consumption and which are subject to the meat-inspection laws. The imported pituitary glands were held not to be meat for human consumption, and were not classified as meat under the tariff act.

In *F. W. Myers & Co., Inc.* v. *United States*, 29 CCPA 30, C.A.D. 167, frozen beef livers, imported from Canada to be used in the manufacture of vitamins and other medicinal products, were nevertheless held to be meat, since they were in fact edible and were of the same class and kind as beef liver that is consumed as meat in the United States. In a subsequent case, however, *United States* v. *Judson-Sheldon Corp.*, 37 CCPA 89, C.A.D. 424, frozen beef livers from Argentina were held not to be meat, on the ground that there had been a finding by duly constituted United States authorities that meat products from Argentina were, in fact, unfit for human consumption, and their entry was expressly prohibited except for pharamaceutical purposes. The court stated:

* * * Therefore, it can be successfully contended that such meats are inedible even though the record discloses, as hereinbefore mentioned, that some of the liver had been cooked and eaten without ill effects. [P. 93.]

At least two cases have been before the court involving frozen beef lungs. In both of these cases it was held that beef lungs are not meat. *W. F. Mackay Estate* v. *United States*, 28 Cust. Ct. 73, C.D. 1391; *A. N. Deringer, Inc., et al.* v. *United States*, 32 Cust. Ct. 41, C.D. 1578. The first case recites several definitions of the tariff term "meat," from various authorities, and concludes:

From these authorities it appears that the term "meat" as used in the tariff acts includes such portions of the animal as are habitually eaten as food, which are of everyday consumption, and which are ordinarily known as, and accepted as, a meat of commerce. [P. 83.]

In the *Deringer* case, there was no evidence that frozen beef lungs were used for human consumption. The court found that they did not belong to the class and kind of beef lungs which were, to some extent, so used. Therefore, they were not meat for tariff purposes.

Several cases have been before the court in which the meat in issue was horsemeat. *Atlas Canning Company, Inc.* v. *United States*, 41 Cust. Ct. 242, C.D. 2047; *Norman G. Jensen, Inc.* v. *United States*, 46 Cust. Ct. 177, C.D. 2254 (modified under Public Law 87–110, 48 Cust. Ct. 304, Abstract 66357). In the *Atlas Canning* case, natural horsemeat had been "decharacterized" before importation, by slashing the meat and treating it with charcoal. This made it unappetizing as food, and readily distinguishable from meats commonly eaten as food. The

decharacterized meat was used in the manufacture of dog food. The court held that it was not to be classified as meat, stating:

> There is no evidence before us that decharacterized horse meat is "habitually eaten as food" or is "ordinarily known as, and accepted as, a meat of commerce." To the contrary, the evidence is that decharacterization makes it unfitted for human consumption and that decharacterized horse meat is used to manufacture dog food. [P. 244.]

The *Norman Jensen* case involved both decharacterized and natural horsemeat. It appeared from the record that the nondecharacterized horsemeat was edible, that it was sold and exported from Canada under laws applicable to the sale and export of meat, and that it was entered into the commerce of the United States subject to the Government regulations for inspection of imported meat. The court held that it was edible. The fact that horsemeat is not among the foods eaten by most residents of the United States, and the fact that the imported horsemeat actually was used to make dog food, did not make the nondecharacterized horsemeat inedible.

The term "edible" was construed by our court of appeals in *United States* v. *Yick Shew Tong Co.*, 25 CCPA 255, T.D. 49392, where the court quoted with approval the following definition from the Century Dictionary and Encyclopedia:

> *Edible*—1. a. Eatable; fit to be eaten as food; esculent; specifically applied to objects which are *habitually* eaten by man, or *specifically* fit to be eaten, among similar things not fit for eating; as edible birds' nests; edible crabs; edible sea-urchins. [P. 268, italics quoted.]

In a recent case, *United States* v. *P. John Hanrahan, Inc., et al.*, 45 CCPA 120, C.A.D. 684, it was held that a substance is edible if it is habitually eaten as an ingredient of foods, even though it cannot, as a practical matter, be eaten by itself.

In the instant case there is no evidence whatsoever that sea lion meat is habitually eaten as food by human beings or that it is known as a meat of commerce. There is no evidence that it has ever been offered or sold for human consumption. It was tasted once by a few members of the crew, and they found it unpalatable. There are no Government meat inspection regulations covering sea lion meat, and this would be a serious dereliction of duty if such meat is, indeed, a meat for human consumption. We do not infer any such official dereliction.

The only uses of sea lion meat shown in the record, are generally as mink feed and, on occasion, in the manufacture of dog and cat food. Defendant presented no evidence showing that sea lion meat is fit for human consumption, or that it is habitually eaten by man, relying on the presumption of correctness attaching to the collector's classification of the sea lion carcasses as "meat." This presumption is not evidence; and it may be, and has been, overcome by the uncontradicted testimony of the witnesses. *United States* v. *Edson Keith & Co.*, 5 Ct. Cust.

Appls. 82, T.D. 34128; *Hawley & Letzerich* v. *United States*, 19 CCPA 47, T. D. 44893.

Defendant also relies on statements in the *Norman Jensen* case, that the fact that horsemeat is a minor item in the diet of the average American family does not make horsemeat inedible. A distinguishing factor is the extensive regulations by the Department of Agriculture in regard to the inspection and handling of horsemeat which is capable of being used as human food. (9 C.F.R., part 29.) There are no such regulations in regard to sea lion meat. There is no finding by any United States authority that sea lion meat is fit for human consumption, and indeed the report (exhibit 2) suggests uses that do not include meat for human consumption.

There is not a scintilla of evidence that sea lion meat has any use in the American diet. The statement from the Encyclopaedia Britannica, quoted in defendant's brief, page 8, to the effect that seal meat is used by primitive peoples for food, is no indication that it is so used by the people of the United States or that it is one of the meats of commerce. The New International Encyclopaedia, volume 20, page 641, noting that the natives of the Pribilof Islands use the flesh of the sea lion for food, states also that the sea lion is of no special commercial importance.

On the record presented, and under the authorities cited, we hold that sea lion meat is not meat, within the meaning of that term as used in paragraph 706 of the Tariff Act of 1930, as modified.

But is sea lion meat "fish" under paragraph 1677, *supra?* In support of the contention that it is, plaintiffs rely on *J. T. Steed & Co. (Inc.)* v. *United States*, 36 Treas. Dec. 544, T.D. 38053, and *Central Commercial Co. et al.* v. *United States*, 11 Ct. Cust. Appls. 131, T.D. 38935. It was held that whale meat should be classified, for tariff purposes, as fish for human consumption. Here, the claim is for classification as fish imported to be used for purposes *other* than human consumption. Therefore, these whale meat cases are relevant here only as to their holding that the meat of whales is, for tariff purposes, fish.

In the cited decisions, support for the holding rested, in part at least, on the language of the tariff provision for oils. That was the 1913 act, which provided as follows:

[Par.] 44. Oils, rendered: Sod, seal, herring, and other fish oil, not specially provided for in this section * * *; whale oil * * *.

It will be noted that seal oil was provided for *eo nomine*, as well as whale oil. Presumably, then, if the subject of the litigation had been the meat of seals, rather than the meat of whales, the holding of the court might well have been that seal meat is to be classified as fish. Whether or not for human consumption, is another matter.

Sea lions are of the seal family. The Encyclopaedia Britannica, volume 20, page 243, states: "Sea lion, the name for larger species of the eared seals (Otariidae), lacking the underfur that makes the skins of fur seals valuable."

Webster's New International Dictionary contains the following definitions:

seal. * * * 1. Any marine aquatic carnivorous mammal of the group Pinnipedia and family Phocidae or Otariidae, including, respectively, the true seals and the eared seals; any pinniped except the walrus. * * * The eared seals (including sea lions, fur seals, etc.) are less modified from land animals and use the limbs for progression on land. * * *

Eared seal. Any seal of the family Otariidae, which comprises the sea lions and fur seals. They are characterized by the independence and mobility of the hind limbs (so that they are able to move with some facility on land), and well-developed but small external ears.

Sea lion. 1. Any of several large, eared seals, natives of the Pacific Ocean. * * *

In the *Central Commercial* case, *supra*, Judge Smith, speaking for a unanimous court, said:

The only question in this case is whether the flesh of the whale is "fish" or "meat" within the meaning of those terms as commonly and ordinarily understood.

Scientifically speaking, the whale is not a fish and is as far from being even a remote cousin to a fish as is a man or a monkey. The whale differs from the fish in that it breathes the air, is a warmblooded animal, and is of the order of mammals known as cetaceans. Nevertheless, from the earliest times down to this hour the whale, because of its habitat, its fishlike form, and its finlike fore limbs and tail, has been called a fish by people in general. Moreover, the conscientious belief for hundreds of years of countless men, women, and children that "The Lord prepared a great fish to swallow up Jonah" (Jonah v. 17), and that that great fish was a whale (Matthew xii, 40), has served to strengthen the popular conception of the whale as a fish, especially as that classification expressed in the language of the times went unchallenged and the doubter, disregarding the fact that the Jonah whale was specially prepared for the occasion, questioned only its ability to do the swallowing.

Wherefore, notwithstanding all the efforts of science and the just indignation of the zoologist, the classification of the whale as a fish has persisted not only among the unlettered but among judges, legislators, and the cultured in general who ought to and probably do know better. Even the ichthyologist, who declines to recognize the whale as a fish, influenced by custom and contaminated by his environment, has no hesitation in speaking of the capture of whales as whale *fishing*, and of the places which they frequent as whale *fisheries*. One would suppose that fishermen went to fisheries to catch fish, still the expression "whale fishing" may be pardoned when it is considered that popular misuse of the verb "fish" has been so far approved that by extension the politician fishes for votes and things may be fished out of the mud as well as out of the water.

To say that a whale is a fish or to speak of "whale fishing" and of "whale fisheries," may be scientifically and linguistically wrong, but the fact remains that such is the popular usage and a popular usage, let it be remembered, sanctioned by the comman law of England, which from the time that "the memory of man runneth not to the contrary," classified the whale, the porpoise, the sturgeon, and the grampus as *royal fish*, which in territorial waters "no man may take without

the King's permit."—Paterson's Fishery Laws (pp. 9–25) ; De Jur. Mar. (ch. 7) ; History of the Foreshore and Sea Shore [3d ed.] (204–412; 17th ed., st. 1.)

Sad to say, judges responsive to the popular will seem to have fallen from the grace of correct speaking, and so "at the Greenland whale fishery the ruling custom was held to be that the first harpooner who struck the fish was entitled to the property of the fish only if he continued to hold the whale by the line attached to the harpoon ; but if his line broke, and a subsequent harpooner from another ship finished the capture by obtaining possession, the latter was entitled, for it was then a loose fish."—Paterson's Fishery Laws (pp. 925) ; Fennings v. Lord Grenville (1 Taunton) ; Littledale v. Scaith (1 Taunton [footnote] 243) ; Hogarth v. Jackson (2 Carrington & Payne, 753) ; Erskin's Principles of the Law of Scotland [14th ed.] pp. 115–116). The Greenland fisheries, by the way, were exploited by English, French, and Americans, and it was held that the customary law of the Greenland fisheries was binding on all who frequented them, and taking precedence of the common law, was binding on British subjects. (1 Taunton, 241, 248, 249.)

It was our fortune to inherit from England much good law, some bad law, and a little indifferent English, in which we may safely include the denomination of the whale as a fish. Some of the good laws have been legislated out of existence to our disadvantage, most of the bad ones amended to our betterment, and the poor English sanctioned by our tariff laws to the extent at least of denominating the whale as a fish, whatever may be the congressional reservation as to the generic term applicable to the porpoise, the sturgeon, and the grampus.

The tariff acts of April 27, 1816, August 30, 1842, and July 30, 1846, laid a duty on "whale and other fish oils," the product of foreign fishing or of foreign fisheries. The act of July 30, 1846, provided separately for animal oils and fish oils, and imposed a duty on "oils, neatsfoot and other animal oil, spermaceti, whale and other fish oil, the produce of foreign fisheries." The act of October 1, 1890, subjected to duty "seal, herring, whale, and other fish oil not specially provided for." The acts of March 3, 1883, October 1, 1890, and August 27, 1894, exempted from duty "spermaceti, whale, and other fish oils of American fisheries." The acts of July 24, 1897, and August 5, 1909, imposed a duty on "seal, herring, whale, and other fish oils," and admitted free of duty "spermaceti, whale, and other fish oils of American fisheries." The act of October 3, 1913, admitted free "spermaceti, whale and other fish oils of American fisheries."

From this legislation it is apparent that for more than a century the oil of the whale has been regarded by Congress as the oil of a fish, and if the oil of the whale be the oil of a fish, consistency requires that the flesh of a whale be classified for tariff, if not for scientific purposes, as the flesh of a fish.

We are regretfully forced to the conclusion that judges, legislators, and people in general have classified the whale as a fish, and as the popular acceptation of tariff terms having no different commercial meaning must prevail as against their scientific signification, we must hold that the whale is a fish and that its flesh is fish, dutiable as provided in paragraph 216 of the act in force [pp. 132–134.]

In *Swan & Finch Co.* v. *United States*, 113 Fed. 243, discussing the dutiable status of cod oil, the Circuit Court of Appeals, Second Circuit, said :

Now, it seems quite clear that congress used the words "fish oils" in the sense in which they are used in common speech. Paragraph 42 provides for "seal, herring, whale, and other fish oil." Evidently these words are not used with technical precision ; for neither the seal nor the whale is a fish, and

therefore oil made from them, or from any part of them, is not technically fish oil. Nor are the words used with a close appreciation of commercial distinctions; for, if the evidence in this case be held sufficient to establish the proposition that cod oil is not known to the trade as a "fish oil," it is equally sufficient to establish the proposition that neither seal oil nor whale oil is fish oil in trade; but congress understood at least whale oil to be a fish oil, and therefore used the phrase "seal, herring, whale and other fish oil." [P. 244.]

Paragraph 52, Tariff Act of 1930, contains provision for oils, animal and fish; and it groups together, as an enumeration , "whale and seal."

In the special provision favoring American fisheries, the products of American fisheries include, by enumeration, marine animals and marine animal oils. Paragraph 1730(a).

The Encyclopaedia Britannica, volume 20, page 242, has an article on "Seal Fisheries," with a subtitle "Early Seal Fishing," which supports the views of Judge Smith in the *Central Commercial* case, *supra*, that in common language the taking of seals is known as fishing. In The Encyclopedia Americana, volume 24, page 480, it is pointed out that "There are world-wide fisheries devoted primarily to the capture and utilization of fur seals and hair seals. Of less importance to these fisheries, but nevertheless objects of the hunt when sufficiently abundant, have been the sea lions, sea elephants, walruses and other marine mammals. * * *"

We are of opinion that the meat of sea lions, like the meat of whales, was thought by Congress to be fish, for tariff purposes. On the record before us, it is fish imported to be used for purposes other than human consumption.

Livers have been held to be meat. *F. W. Myers & Co., Inc.* v. *United States*, 29 CCPA 30, C.A.D. 167. They are, in this case, the meat of fish, as is the carcass. Inasmuch as the record shows that the livers, also, were imported to be used in mink feed, they are entitled to classification under paragraph 1677.

In view of our decision that these sea lion carcasses and livers are enumerated as fish imported to be used for purposes other than human consumption, we do not have occasion to consider the alternative claims under paragraph 1558.

The protest claim to classification under paragraph 1677 is sustained.

Judgment will be entered accordingly.